IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

EDWARD BARBER,

                         Petitioner,

          v.

RUSSELL PERDUE, Warden,[1]

                        Respondent.

Civil Action No.
9:11-CV-0127 (NAM/DEP)

_____

APPEARANCES:

FOR PLAINTIFF:

EDWARD BARBER, *Pro Se*
56425-054
Atlanta U.S. Penitentiary
P.O. Box 150160
Atlanta, Georgia 30315

FOR DEFENDANT:

HON. RICHARD S. HARTUNIAN        CHARLES E. ROBERTS, ESQ.
United States Attorney, N.D.N.Y.     Assistant U.S. Attorney
P.O. Box 7198
100 S. Clinton Street
Syracuse, New York 13261-7198

_____

       [1]     In his petition, Barber named Deborah Schult, who, at the time Barber commenced this action, served as the warden at the Ray Brook Federal Correctional Institution ("FCI Ray Brook"), as a respondent. Because publically available information discloses that Russell Perdue became the warden at FCI Ray Brook in February 2011, he is now the appropriately named respondent, and the clerk of the court is respectfully directed to adjust court records to reflect this change.

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

*Pro se* petitioner Edward Barber, a federal prison inmate as a result of a drug and money laundering conviction, has commenced this proceeding pursuant to 28 U.S.C. § 2241, seeking habeas relief from this court. In his petition, Barber challenges his transfer into FCI Ray Brook, a medium security prison, and seeks to be returned to a Bureau of Prisons ("BOP") prison camp similar to that in which he was confined prior to having been found guilty of possessing intoxicants, in violation of prison disciplinary rules.

In answer to the petition, respondent argues that it is procedurally defective based upon Barber's failure to properly exhaust available administrative remedies before commencing suit, and in any event fails to state a cognizable constitutional or statutory claim warranting habeas intervention. For the reasons set forth below, I recommend that Barber's petition be dismissed based upon his failure to satisfy his obligation to exhaust available administrative remedies before commencing this proceeding, and in any event, as lacking in merit.

I.    BACKGROUND

Petitioner is serving a 120-month term of imprisonment based upon a conviction entered in the District of Maryland for conspiracy to distribute, and to possess with intent to distribute, five kilograms or more of cocaine, in violation of 21 U.S.C. § 846, and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).  Petition (Dkt. No. 1) at p. 3 and Exh. A; Magnusson Decl. (Dkt. No. 4-2) ¶ 5.  Petitioner's projected release date, with anticipated good conduct time credits, is August 31, 2015.  Magnusson Decl. (Dkt. No. 4-2) ¶ 5.

Petitioner began serving his federal sentence in a minimum security level prison camp operated by the Bureau of Prisons ("BOP") in Schuykill, Pennsylvania, on March 20, 2007.[2]  Petition (Dkt. No. 1) at p. 6.  On July 20, 2007, however, he was transferred into a low security correctional institution located in Allenwood, Pennsylvania ("LSCI Allenwood"), after being convicted of possessing intoxicants, in violation of prison rules.  *Id.*; *see also* Magnusson Decl. (Dkt. No. 4-2) ¶ 7.

_____

[2]    The BOP has five security classification levels for its correctional facilities, including minimum, low, medium, high, and administrative. BOP Program Statement 5100.08), Ch. 1 at p. 15.  *See Johnson v. Killian*, No. 07 Civ. 6641 (NRB), 2010 WL 3468124 at *1-3 (S.D.N.Y. Aug. 23, 2010), *vacated and remanded on other grounds by* 680 F.3d 234 (2d Cir. 2012).

In June of 2010, Barber filed an Administrative Remedy Report ("AR"), pursuant to the BOP's internal inmate grievance program, challenging his transfer into LSCI Allenwood and requesting that he be returned back into a minimum security facility.[3]  Petition (Dkt. No. 1) at p. 6; Magnusson Decl. (Dkt. No. 4) ¶ 7 and Exh. C.  On July 9, 2010, following the denial of that grievance, which was designated as AR No. 597261, petitioner appealed the matter to the BOP Regional Director.  Petition (Dkt. No. 1) at p. 3 and Exh. E; Magnusson Decl. (Dkt. No. 4-2) ¶¶ 7-8 and Exhs. C, D.  In response to that appeal, the Regional Director advised Barber on August 17, 2010, that his situation was under review and that he was being considered for a transfer into a minimum security facility.  Petition (Dkt. No. 1) at p.7 and Exh. F; Magnusson Decl. (Dkt. No. 4-2) ¶ 8 and Exh. D.  Barber's appeal was therefore deemed partially granted, and he was advised of his right to appeal the determination to the Office of General Counsel within thirty days of the date of decision.  *Id.*  Petitioner, however, did not seek further review of that decision.  Petition (Dkt. No. 1) at p. 8; Magnusson Decl. (Dkt. No. 4-2) ¶ 9.

In September 2010, Barber was transferred from LSCI Allenwood into FCI Ray Brook, and was assigned to the facility's Work Cadre program.

---

[3]     The BOP's administrative grievance process is more fully described further below in this report.  *See* pp. 10-11, *post.*

Petition (Dkt. No. 1) at p. 8. That program involves inmates designated to FCI Ray Brook who are assigned to work in various maintenance positions within the institution, including in the areas of groundskeeping, food and trust fund warehouse operations, UNICOR warehouse operations, the garage motor pool, and participating in general orderly details of the training center and institution front lobby.[4] Porter Decl. (Dkt. No. 4-3) ¶ 5. Work Cadre unit inmates perform much of their work outside of the secure perimeter of FCI Ray Brook, and a vast majority of inmates in the program are therefore assigned "OUT Custody" status, with either a minimum or low security level designation.[5] *Id.* Under BOP policies, a facility's security level designation is

_____

[4]       Standing alone, the requirement that prison inmates perform work-related functions while incarcerated does not run afoul of the Thirteenth Amendment's prohibition against involuntary servitude. *See Alexander v. Schenk*, 118 F. Supp. 298, 302 (N.D.N.Y. 2000) (Kahn, J.) (holding that, even if the court was to find that the plaintiff was required to work without any compensation while incarcerated, his claim would fail because the Thirteenth Amendment "on its face, excludes 'involuntary servitude imposed as a legal punishment for a crime'") (quoting U.S. Const. amend. XIII).

[5]       The BOP defines the "OUT Custody" classification as

> [t]he second lowest custody level assigned to an
> inmate requiring the second lowest level of
> security and staff supervision. An inmate who
> has OUT custody may be assigned to less secure
> housing and may be eligible for work details
> outside the institution's secure perimeter with a
> minimum of two hour intermittent staff
> supervision.

BOP Program Statement 5100.08; *see* Porter Decl. (Dkt. No. 4-3) at p. 2, n.1.

used

> to describe the structural variables and inmate-to-staff
> ratio provided at the various types of Bureau
> institutions (*i.e.,* Minimum, Low, Medium, High).  It
> also identifies the institution type required to house
> inmates based upon their histories, institutional
> adjustment, and Public Safety Factors as well as the
> physical security of the institution to include mobile
> patrols, gun towers, perimeter barriers, housing,
> detection devices, inmate-to-ratio, and internal
> security.

*Id.* at 2 n.1*; see also Johnson*, 2010 WL 3468124, at *1-2.[6]  Of the thirty-nine

inmates assigned to the Work Cadre Unit at FCI Ray Brook, thirty-six of

those, including Barber, are designated as minimum security/OUT custody.

Porter Decl. (Dkt. No. 4-3) ¶¶ 5-6.  At FCI Ray Brook, Work Cadre inmates

are housed together in a single unit, although they can be interspersed with

general population inmates when taking meals, shopping at the commissary,

obtaining health services for mental health treatment, and in other areas and

programs.  Petition (Dkt. No. 1) at pp. 7-8.

Following his arrival at FCI Ray Brook, Barber challenged his transfer

by filing an informal resolution, claiming that the transfer was inconsistent

with his minimum security status.  Petitioner's Reply (Dkt. No. 6), Exh. J.

---

[6]     Copies of all unreported decisions cited in this report and recommendation
have been appended for the convenience of the *pro se* petitioner.

Because this informal measure did not resolve the issue, petitioner filed an AR, designated as AR No. 617842. *Id.*, Exh. K; Magnusson Decl. (Dkt. No. 4-2) ¶ 10 and Exh. E. Following the denial of that AR by the Warden at FCI Ray Brook, Barber appealed the determination to the Regional Director on February 14, 2011, reiterating his contentions and arguing that his placement in the FCI Ray Brook Work Cadre program was inappropriate. Petitioner's Reply (Dkt. No. 6), Exh. L; Magnusson Decl. (Dkt. No. 4-2) ¶ 11 and Exh. F. That appeal was denied on February 9, 2011, by BOP Regional Director J.L. Norwood, and Barber was advised of his right to appeal that denial to the BOP General Counsel within thirty days of the date of response. Magnusson Decl. (Dkt. No. 4-2) ¶ 11 and Exh. F.

Petitioner appealed the matter to the Office of General Counsel on March 2, 2011. Petitioner's Reply (Dkt. No. 6), Exh. M; Magnusson Decl. (Dkt. No. 4-2) ¶ 12 and Exh. B. By notice dated May 10, 2011, that appeal was denied based upon a finding that Barber was appropriately designated to his current placement, consistent with the requirements of BOP Program Statement 5100.08, which is entitled "Inmate Security Designation and Custody Classification." Petitioner's Suppl. Reply (Dkt. No. 7) at pp. 2-3 and

Exh. A.[7]

II.  <u>PROCEDURAL HISTORY</u>

Petitioner commenced this proceeding on February 4, 2011.  Dkt. No.

1.  In his petition, Barber challenges the decision to transfer him into FCI Ray

Brook, claiming that it violated 18 U.S.C. § 3621(b) and BOP Program

Statement No. 5100.08, and resulted in a deprivation of procedural due

process and a denial of equal protection.  *Id.*  The respondent has since

submitted various documents in opposition to the petition, asserting that

petitioner's claims are procedurally barred based upon his failure to exhaust

available administrative remedies before commencing this proceeding, and

additionally maintaining that, in any event, the claims lack merit.[8]  Dkt. Nos. 4,

5.  Barber has since submitted both a reply and a supplemental reply.  Dkt.

Nos. 6, 7.

Barber's petition, which is now fully briefed and ripe for determination,

has been referred to me for the issuance of a report and recommendation,

pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local

---

[7]      Petitioner's supplemental reply, filed on June 6, 2011, is accompanied by a motion to supplement the record in order to permit inclusion of the final denial of AR No. 617842.  Dkt. No. 7.  That motion is granted, and the material accompanying the motion has been considered by the court.

[8]      In the response to Barber's petition, respondent does not address the statutory arguments raised.

Rule 72.3(c).  *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Exhaustion of Remedies

In his petition, Barber challenges his designation to FCI Ray Brook on several substantive grounds.  In answer to the petition, respondent argues that Barber's challenge is procedurally barred based upon his failure to exhaust available administrative remedies.

Barber's petition challenging his prison designation is properly brought pursuant to 28 U.S.C. § 2241.  *See Jiminian v. Nash*, 245 F.3d 144, 146 (2d Cir. 2001) ("A motion pursuant to § 2241 generally challenges the execution of a federal prisoner's sentence, including such matters as . . . prison transfers, [and] type of detention[.]") (citing *Chambers v. United States*, 106 F.3d 472, 474-75 (2d Cir. 1997)); *see also Carmona v. U.S. Bureau of Prisons*, 243 F.3d 629, 632 (2d Cir. 2001) ("A writ of habeas corpus under § 2241 is available to a federal prisoner who does not challenge the legality of his sentence, but challenges instead its execution subsequent to his conviction.").  Before instituting such a habeas proceeding, however, a prison inmate must first exhaust the remedies available through the BOP's Administrative Remedies Program.  *Carmona*, 243 F.3d at 630 ("We have

9

held that federal prisoners must exhaust their administrative remedies prior to filing a petition for habeas relief." (citing *Guida v. Nelson*, 603 F.2d 261, 262 (2d Cir. 1979)); *see also Rogers v. United States*, 180 F.3d 349, 357 (1ˢᵗ Cir. 1999).

Available to all federal prison inmates is an internal, four-step administrative grievance procedure adopted by the BOP for the stated purpose of "allow[ing] an inmate to seek formal review of an issue relating to any aspect of his/her own confinement."  28 C.F.R. § 542.10(a); *see also Macias v. Zenk*, 495 F.3d 37, 42 (2d Cir. 2007).  The first step of the prescribed process entails making an effort to obtain an early resolution of the matter by raising the issue informally to staff.  28 C.F.R. § 542.13(a); *see also Johnson v. Testman,* 380 F.3d 691, 693 (2d Cir. 2004).  In the event this avenue does not lead to a successful resolution, the inmate next may submit a formal written AR to the warden of the particular facility involved, utilizing a designated BP-9 form, within twenty days of the relevant event.  28 C.F.R. § 542.14(a).  If the AR is denied, an appeal may be taken to the appropriate BOP Regional Director within twenty calendar days of the date of denial.  28 C.F.R. § 542.15(a); *see also Johnson,* 380 F.3d at 693.   As a fourth and final step, an unfavorable decision from the Regional Director may be appealed to

the General Counsel's office (also referred to as the "Central Office") within thirty days of the date on which the Regional Director rejects the inmate's appeal.  28 C.F.R. § 542.15(a). Only upon completion of all of the required steps in the process does a federal inmate fully exhaust available administrative remedies.  *Macias,* 495 F.3d at 42; *see also Johnson v. Rowley*, 569 F.3d 40, 45 (2d Cir. 2009); *Strong v. Lapin*, No. 90-CV-3522, 2010 WL 276206, at * 4 (E.D.N.Y. 2010) ("Until the BOP's Central Office considers the appeal, no administrative remedy is considered to be fully exhausted.").

Two separate ARs filed by Barber are implicated in this proceeding.  As was previously discussed, the first, AR No. 597261, was filed while Barber was confined in LSCI Allenwood, and challenged his transfer into that facility. Magnusson Decl. (Dkt. No. 4-2) ¶ 7 and Exh. C.  The remedy sought in that AR, *inter alia*, included a request that he be transferred into another BOP facility, commensurate with his security level designation.  *See id.,* Exh. C. That AR was successful in large part, in that at the Regional Director level Barber was advised that he was, in fact, being considered for a transfer to a minimum security facility.  *Id.,* Exh. D.

Plaintiff's subsequent transfer into FCI Ray Brook generated a second

grievance, AR No. 617842, challenging that transfer and his placement into the facility's Work Cadre program. Magnusson Decl. (Dkt. No. 4-2) ¶ 11 and Exh. F. That grievance represents petitioner's attempt to exhaust remedies with regard to the claims now raised in this action. As discussed above, this grievance was ultimately denied by the Central Office on May 10, 2011. Petitioner's Suppl. Reply (Dkt. No. 7), Exh. A. Because petitioner filed his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 in this court on February 4, 2011 – more than two months prior to receiving the Central Office's final determination of his appeal – the court is confronted with whether, as respondent contends, a petitioner who has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 has failed to exhaust administrative remedies where he receives the Central Office's final decision regarding his appeal *after* filing his petition in federal court.

Initially, the court notes that the exhaustion requirements imposed under 42 U.S.C. § 1997e(a), a provision added as part of the Prison Litigation Reform Act ("PLRA"), do not apply to petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. *See Carmona*, 243 F.3d at 634 ("[W]e note that although § 1997e(a) of the [PLRA] . . . contains a statutory administrative exhaustion requirement, we have held, in the context of a § 2254 petition,

that the requirements of the [PLRA] do not apply to habeas proceedings . . . .

Doubtless the same rule should obtain in § 2241 cases as in § 2254

petitions.").[9]  Instead, the exhaustion requirements applicable to 28 U.S.C. §

2241 petitions were created by case law.  *See, e.g., Garza v. Davis*, 596 F.3d

1198, 1203 (10th Cir. 2010) ("The exhaustion of available administrative

remedies is a prerequisite for § 2241 habeas relief, although we recognize

that the statute itself does not expressly contain such a requirement."); *Marti*

*v. Nash*, 227 F. App'x 148, 150 (3d Cir. 2007) ("Although there is no statutory

exhaustion requirement attached to § 2241, we have consistently applied an

exhaustion requirement to claims brought under § 2241.") (internal quotation

marks omitted).

The Second Circuit has held that a petitioner may pursue a request for

habeas corpus relief, including pursuant to 28 U.S.C. § 2241, even where he

has failed to exhaust administrative remedies prior to filing the action in

---

[9]        *See also Walker v. O'Brien*, 216 F.3d 626, 634 (7th Cir. 2000) ("[W]e
conclude that cases properly brought under §§ 2241 or 2254 as habeas corpus petitions
are not subject to the PLRA."); *Blair-Bey v. Quick*, 151 F.3d 1036, 1040 (D.C. Cir. 1998)
("[W]e see no reason to make an exception from our general rule that the PLRA does not
apply to actions properly brought in habeas corpus."); *Davis v. Fechtel*, 150 F.3d 486, 490
(5th Cir. 1998) ("The PLRA . . . does not apply to section 2241 proceedings."); *McIntosh v.
United States Parole Comm'n*, 115 F.3d 809, 811-12 (10th Cir. 1997) (holding that the
PLRA does not apply to habeas petitions filed pursuant to 28 U.S.C. § 2241); *Colton v.
Ashcroft*, 299 F. Supp. 2d 681, 687 (E.D. Ky. 2004) (extending the Sixth Circuit's finding
that the PLRA does not apply to 28 U.S.C. §§ 2254 and 2255 proceedings by concluding
that the PLRA does also does not apply to 28 U.S.C § 2241).

district court, only upon a showing of cause and prejudice.  *Carmona*, 243

F.3d at 634 ("[T]he interests of judicial economy and accuracy are served by

requiring that, absent a showing of cause and prejudice, appeals proceed in

the first instance through the federal agency review process.").  The Second

Circuit explained the reasoning behind this requirement in the following

manner:

> Following the administrative procedures could
> potentially obviate the need for judicial review, or at a
> minimum, develop the factual record at the agency
> level at a time when the disputed events are still
> relatively fresh in witness' minds. . . . Administrative
> autonomy is also served by requiring that a federal
> prisoner justify his failure to exhaust his intra-Bureau
> remedies.  When, however, legitimate circumstances
> beyond the prisoner's control preclude him from fully
> pursuing his administrative remedies, the standard we
> adopt excuses this failure to exhaust.

*Id.*

     In light of the fact that neither the Second Circuit nor any court in this

district has explicitly ruled on the circumstances the court faces in this case, I

recommend a finding that a petitioner who receives a final administrative

determination of his grievance during the pendency of a related habeas

petition in federal court has not exhausted his administrative remedies,

unless he demonstrates cause and prejudice for prematurely filing his petition

in federal court. This recommendation is in line with the Supreme Court's decision in *Rhines v. Weber*, 544 U.S. 269, 125 S. Ct. 1528 (2005). In that case, the Supreme Court held that a district court may stay a mixed petition, where some of petitioner's claims were unexhausted in state court, only when it "determines there was good cause for the petitioner's failure to exhaust his claims first in state court." *Rhines*, 544 U.S. at 277, 125 S. Ct. at 1535. In addition, this recommended finding aligns with the Second Circuit's requirement that a district court excuse a petitioner's failure to exhaust only upon a showing of cause and prejudice. *Carmona*, 243 F.3d at 634. Finally, although one district court has held that the Supreme Court's decision in *Rhines* "at least implicitly [suggests] that subsequently exhausting available remedies cures an initial lack of exhaustion in the habeas context[,]" *Mihailovich v. Berkebile*, 06-CV-1603, 2007 WL 942091, at *6 (N.D. Tex. Mar. 28, 2007), I read *Rhines* to neither demand a district court to stay a petition under any circumstances, nor preclude dismissing a petition for failure to exhaust. *See e.g., Seastrong v. Berkebile*, 08-CV-1853-M, 2008 WL 4999017, at *3 n.2 (N.D. Tex. Nov. 24, 2008) ("While these [Supreme Court] cases implicitly indicate that exhausting available remedies after filing a habeas action may cure an initial lack of exhaustion, they do not preclude

dismissal of [an] action even if [a] petitioner has subsequently exhausted his administrative remedies.") (internal citation omitted).

Here, petitioner's papers demonstrate neither that he had good cause for filing his habeas petition in federal court prior to receiving the Central Office's final determination, nor, even assuming cause existed, prejudice. Rather, in his reply, petitioner admits that he "has yet to receive the Central Office response[.]" Petitioner's Reply (Dkt. No. 6) at p. 3. Accordingly, I recommend that Barber's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 be denied, without prejudice, for failing to exhaust his available administrative remedies.

B.    Merits of Petitioner's Claims

In his petition, Barber argues that in transferring him into FCI Ray Brook, the BOP failed to adhere to statutory and regulatory requirements, and further that the agency violated his rights by depriving him of a vested liberty interest without procedural due process. He additionally claims that prison officials deprived him of equal protection as a result of his transfer into FCI Ray Brook. In answer to these claims, respondent asserts that Barber has no protected liberty interest in being confined to any particular BOP facility, and therefore cannot state a cognizable due process claim.

Respondent also maintains that his equal protection and statutory claims are similarly deficient as a matter of law.

### 1. Due Process

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process, a party must show that he or she (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). In this instance, the facts set forth in Barber's petition fail to establish the deprivation of a constitutionally significant liberty interest.

By law, the BOP is vested with wide ranging discretion to designate a facility in which a federal prison inmate is to be held. 18 U.S.C. § 3621(b); *see also Levine v. Apker*, 455 F.3d 71, 80-81 (2d Cir. 2006); *Barden v. Koehane*, 921 F.2d 476, 482 (3d Cir. 1990). Addressing the question of placement of a federal inmate, the governing statute provides, in relevant part, as follows:

> The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility . . ., whether within or without the judicial district in which the person was convicted. . . . The Bureau may at any time . . ., direct the transfer of a prisoner from one penal or correctional facility to another.

18 U.S.C. § 3621(b).

It is well-established that an inmate has no protectable liberty interest in being designated to a particular facility, even if the facility into which a prisoner is transferred is undesirable to the prisoner. *Olim v. Wakinekona,* 461 U.S. 238, 245-46, 103 S. Ct. 1741, 1745-46 (1983) (holding that a prisoner has no constitutional right to be incarcerated in any particular state); *Meachum v. Fano*, 427 U.S. 215, 224, 96 S. Ct. 2532, 2538 (1976) ("The Constitution does not . . . guarantee that the convicted prisoner will be placed in any particular prison."). The United States Supreme Court has long held that, "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S. Ct. 2543, 2547 (1976). "If a the prisoner can lawfully be held in the facility into which he has been

transferred, he cannot object to that transfer, even if the transfer results in his being placed in a more restrictive or less [desirable] facility." *Ali v. Gibson*, 631 F.2d 1126, 1135 (3d Cir. 1980)*, accord, Hookey v. Lomas*, No. 1:CV-08-022884, 2010 WL 1009946, at *6 (M.D. Pa. March 11, 2010).

Since Barber cannot establish that his transfer into FCI Ray Brook implicated a protecable liberty interest under the Fourteenth Amendment, his procedural due process claim is subject to dismissal as a matter of law. S*ee Meachum*, 427 U.S. at 225, 96 S. Ct. at 2538 ("That life in one prison is much more disagreeable than in another does not in itself signify that Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules.").

2.    Equal Protection

In his petition, Barber also contends that his transfer into FCI Ray Brook resulted in the denial of equal protection, alleging that, as a result of his transfer, he has been treated by the BOP differently than other similarly situated inmates, including those in other BOP facilities. Respondent also urges dismissal of Barber's equal protection claim on the merits.

The Equal Protection Clause directs state actors to treat similarly situated people alike. *See City of Cleburne, Texas v. Cleburne Living Ctr.*,

19

473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the Equal Protection Clause, the petitioner must demonstrate that he was treated differently than others similarly situated, as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia*, *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S. Ct. 1756, 1767 (1987)). The petitioner must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not 'reasonably related to legitimate penological interests.'" *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (quoting *Shaw v. Murphy*, 532 U.S. 223, 225, 121 S.Ct. 1475, 1478 (2001) (alterations omitted)).

Petitioner's equal protection claim is based upon a class-of-one paradigm. Barber does not allege that he is a member of a group that received disparate treatment in comparison to other similarly situated inmates. Rather, he argues that he has been singled out for differential treatment from other similarly situated inmates, citing as one example an inmate who was transferred from a satellite camp to LCSI Allenwood for possessing intoxicants, and then later returned back to a minimum security

level institution.  He also argues that, while he is similarly situated to other

inmates throughout the BOP with minimum security levels, unlike him, they

are not being forced to participate in a Work Cadre program at a higher level

security institution.

A class-of-one equal protection claim is stated "where the plaintiff

alleges that she has been intentionally treated differently from others similarly

situated and that there is no rational basis for the difference in treatment."

*Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073 (2000).

In this circuit, to succeed on such a claim, a party must establish that

> (i) no rational person could regard the circumstances
> of the plaintiff to differ from those of a comparator to a
> degree that would justify the differential treatment on
> the basis of a legitimate government policy; and (ii)
> the similarity in circumstances and difference in
> treatment are sufficient to exclude the possibility that
> the defendant acted on the basis of a mistake.

*Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005), *overruled on other*

*grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008); *see also*

*Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010).

The Second Circuit has noted that application of a class-of-one equal

protection standard will differ depending upon whether the case involves

discretionary decisionmaking, or instead flows from non-discretionary action.

*Analytical Diagnostic Labs, Inc.,* 626 F.3d at 141. As the Supreme Court has observed, a class-of-one equal protection claim is readily available when governmental action can be gauged by a clear standard. *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 602, 128 S. Ct. 2146 (2008). In the case of discretionary decisionmaking, the test to be applied is significantly more relaxed, particularly in instances such as in the employment arena, for example, where decisions are often subjective and highly individualized. *Analytical Diagnostic Labs, Inc.*, 626 F.3d at 141 (citing *Engquist,* 553 U.S. at 604, 128 S. Ct. 2146 (2008)).

In this instance, there is no objective standard at issue. Instead, this case falls in the discretionary category. Under Program Statement 5100.08, the BOP is invested with considerable latitude concerning assignment of inmates, subject only to the statutory requirement that certain factors be taken into consideration when making that significantly subjective determination. Exercising that discretion, BOP decision-makers placed Barber in a minimum security Work Cadre program, fully consistent with his security level, and assigned him a minimum security/OUT designation permitting him to work in and around the prison where higher level security inmates are not allowed in light of security concerns. Porter Decl. (Dkt. No.

4-3) ¶¶ 5 and 6; Magnusson Decl. (Dkt. No. 4-2) Exh. E at p. 34-38;

Petitioner's Suppl. Reply (Dkt. No. 7), Exh. A.  His designation to FCI Ray

Brook, a medium-security prison, was apparently prompted by the BOP's

practice of attempting to designate an inmate to a facility located within five

hundred miles of his or her release residence.[10]  Petitioner's Suppl. Reply

(Dkt. No. 7) Exh. A.

This matter is materially distinguishable from such cases as *Village of*

*Willowbrook*, which involved a property owner's request for permission to

connect to a municipal water supply where she was required to grant a thirty-

three foot easement for that purpose whereas other property owners were

required to provide only fifteen foot easements.  528 U.S. at 565, 120 S. Ct.

at 1075.  The Supreme Court concluded that plaintiff's allegations sufficed to

---

[10]     The controlling provision of Program Statement 5100.08 provides as follows:

> The Bureau of Prisons attempts to place each
> inmate in an institution that is reasonably
> close to the anticipated release area.
> Ordinarily, placement within 500 miles of a
> release area is to be considered reasonable,
> regardless of whether there may be an
> institution closer to the inmate's release area.
> This MGTV may also apply to inmates who
> are within 36 months of release.

BOP Program Statement P5100.08, ch. 5, at p. 3.

state a class-of-one equal protection claim since the difference in treatment alleged gave the appearance of being irrational and wholly arbitrary. *Id.*

Applying these principles to the instant case, there is nothing in the record now before the court to suggest that Barber was intentionally treated differently from other similarly situated inmates for no rational reason or that discriminatory animus motivated his assignment to FCI Ray Brook. Accordingly, I recommend denial of his equal protection habeas claim.

### 3. Statutory Violation

Section 3621(b), which governs the assignment of prisoners, as well as transfers within the federal penal system, confers broad discretion upon the BOP in that regard. 18 U.S.C. § 3621(b) ("The [BOP] may at any time . . . direct a transfer of a prisoner from one penal or correctional facility to another."); *see also Levine v. Apker*, 455 F.3d 71, 80 (2d Cir. 2006) (citing cases). While conferring extensive discretion, the statute goes on to list a series of factors to be considered in making that determination, including

> (1) the resources of the facility contemplated; (2) the nature and circumstances of the offense; (3) the history and characteristics of the prisoner; (4) any statement by the court that imposed the sentence . . .; and (5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.

18 U.S.C. § 3621(b); *see also Levine*, 455 F.3d at 81.

In this instance, there does not appear to be any dispute involving Barber's security level.  Consistent with BOP Program Statement 5100.08, he has been designated as a minimum security level, resulting in a possible custody level of "Community" and "OUT."  In this instance, Barber is designated as having "OUT" custody status.  Designation of the petitioner to FCI Ray Brook, with a minimal security level and OUT custody designation, appears to be fully consistent with both the requirements of section 3621 and BOP program statement 5100.08.  I therefore recommend a finding that no statutory violation has been established with regard to petitioner's classification or designation to FCI Ray Brook.

IV.    SUMMARY AND RECOMMENDATION

By statute, the BOP is invested with considerable discretion in assigning federal inmates to BOP facilities, subject to consideration of various relevant factors which must inform that determination.  In carrying out its responsibilities for designating inmates to federal facilities the BOP, with its expertise, is undeniably faced with many constraints and challenges.  For this reason, courts typically afford considerable deference to decisions made by that agency.  It is neither appropriate nor desirable for a court to

micromanage that decisionmaking process and serve as an appellate body for disgruntled inmates to challenge their facility designations, unless it can be shown that the decision made in a particular case has run afoul of the protections afforded by statute or the United States Constitution. *See Meachum*, 427 U.S. at 228-29, 96 S. Ct. 2532 (declining to apply procedural protections of the Due Process Clause to the daily functioning of state prisons and to "involve the judiciary and issues and discretionary decisions that are not the business of federal judges").

In this instance, the arguments asserted by the petitioner, including that his due process and equal protection rights were violated by his designation at FCI Ray Brook, lack merit. Moreover, his claims in this matter are procedurally barred by virtue of his failure to fully exhaust available administrative remedies before commencing this proceeding. Accordingly, it is hereby respectfully

RECOMMENDED that the petition in this matter be DENIED and DISMISSED in all respects; and it is further

RECOMMENDED, based upon my finding that Barber has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2), that a certificate of appealability not issue with respect to

any of the claims set forth in this petition.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     November 8, 2012
           Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

227 Fed.Appx. 148, 2007 WL 1072969 (C.A.3 (N.J.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 227 Fed.Appx. 148, 2007 WL 1072969 (C.A.3 (N.J.)))**



This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Third Circuit LAR, App. I, IOP 5.7. (Find CTA3 App. I, IOP 5.7)

United States Court of Appeals,
Third Circuit.
Pedro MARTI, Appellant
v.
Warden John NASH.

No. 06-2522.
Submitted Under Third Circuit LAR 34.1(a) April 6, 2007.
Filed: April 11, 2007.

**Background:** Prisoner brought habeas petition seeking removal of public safety factor assignment that prevented his being placed at minimum security level facility. The United States District Court for the District of New Jersey, Jerome B. Simandle, J., dismissed petition. Prisoner appealed.

**Holdings:** The Court of Appeals held that:

(1) prisoner failed to exhaust administrative remedies;

(2) prisoner had no due process right to any particular security classification; and

(3) prisoner's claim was not grounds for habeas relief.

Affirmed.

West Headnotes

**[1] Habeas Corpus 197 ☞342**

197 Habeas Corpus
    197I In General
        197I(D) Federal Court Review of Petitions by State Prisoners
            197I(D)2 Particular Errors and Proceedings
                197k332 Criminal Prosecutions
                    197k342 k. Sentence and Punishment. Most Cited Cases

Petitioner failed to fully exhaust his administrative remedies, as required prior to bringing habeas petition seeking removal of public safety factor assignment that prevented his being placed at minimum security level facility; prisoner failed to appeal adverse decision of regional director of Bureau of Prisons (BOP) to BOP's Office of General Counsel. 28 U.S.C.A. § 2241.

**[2] Constitutional Law 92 ☞4824**

92 Constitutional Law
    92XXVII Due Process
        92XXVII(H) Criminal Law
            92XXVII(H)11 Imprisonment and Incidents Thereof
                92k4824 k. Discipline and Classification. Most Cited Cases

**Prisons 310 ☞223**

310 Prisons
    310II Prisoners and Inmates
        310II(E) Place or Mode of Confinement
            310k223 k. Classification; Security Status. Most Cited Cases
    (Formerly 310k13(5))

Prisoner, whose assignment to public safety factor "greatest severity" prevented his being placed at minimum security level facility, had no due process right to any particular security classification. U.S.C.A. Const.Amend. 5.

**[3] Habeas Corpus 197 ☞514**

197 Habeas Corpus
    197II Grounds for Relief; Illegality of Restraint
        197II(B) Particular Defects and Authority for Detention in General

Page 2

227 Fed.Appx. 148, 2007 WL 1072969 (C.A.3 (N.J.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 227 Fed.Appx. 148, 2007 WL 1072969 (C.A.3 (N.J.)))**

197k512 Nature and Place of Confinement

197k514 k. Place of Confinement; Transfer. Most Cited Cases

Habeas petitioner's claim that Bureau of Prisons (BOP) violated his Sixth Amendment rights by relying on facts pertaining to a charge to which he did not plead guilty in assigning him a public safety factor classification that prevented his being placed at minimum security level facility was not grounds for habeas relief, since petitioner's challenge was to the execution of his sentence, rather than the imposition of his sentence. U.S.C.A. Const.Amend. 6; 28 U.S.C.A. § 2241.

**\*149** On Appeal From the United States District Court For the District of New Jersey (D.C.N.J. No. 05-cv-02344), District Judge: Honorable Jerome B. Simandle.Pedro Marti, Fort Dix, NJ, pro se.

Irene Dowdy, Office of United States Attorney, Trenton, NJ, for Warden John Nash.

BEFORE: SLOVITER, McKEE and AMBRO, Circuit Judges.

OPINION
PER CURIAM.

**\*\*1** Appellant, Pedro Marti, appeals the judgment of the United States District Court for the District of New Jersey dismissing his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. For the reasons that follow, we will affirm.

In October 2002, Appellant pleaded guilty to one count of conspiracy to possess and distribute narcotics and was sentenced to 120 months of imprisonment to be followed by five years of supervised release. Based on the facts provided in Appellant's pre-sentence investigation report, the Bureau of Prisons ("BOP"), in connection with its inmate security designation and custody classification procedures, assigned Appellant a public safety factor of "greatest severity." This assignment precludes

Appellant from being placed at a minimum security level facility. See BOP Program Statement 5100.08, Chapter 5, p. 7. Appellant filed a request for an administrative remedy with Appellee, Warden John Nash, seeking removal of the assignment. Appellee declined to do so and upheld the custody classification. Appellant appealed that decision to the regional director of the Federal Bureau of Prisons, who denied the appeal. Appellant did not appeal that decision to the Office of General Counsel, Federal Bureau of Prisons. Instead, Appellant filed a petition for writ of habeas corpus with the District Court. After determining that the petition was properly brought under § 2241, as Appellant challenged the "execution" of his sentence, see **\*150**Woodall v. Federal Bureau of Prisons, 432 F.3d 235, 243-44 (3d Cir.2005), the District Court dismissed the petition, concluding that Appellant had failed to exhaust his administrative remedies and, in the alternative, that his petition lacked merit.

We have jurisdiction over this appeal pursuant to 28 U.S.C. §§ 1291 and 2253(a). We exercise plenary review over the District Court's legal conclusions. Cradle v. United States, 290 F.3d 536, 538 (3d Cir.2002).

[1] "Although there is no statutory exhaustion requirement attached to § 2241, we have consistently applied an exhaustion requirement to claims brought under § 2241." Callwood v. Enos, 230 F.3d 627, 634 (3d Cir.2000). Appellant has failed to fully exhaust his administrative remedies. He asserts, however, that his failure to exhaust should be excused because he never received a response to his administrative appeal due to the "deplorable" condition of the prison's mailing system. Even if we were to excuse Appellant's failure to exhaust his administrative remedies, we would agree with the District Court that his claims are without merit.

[2] In order to obtain relief under § 2241, Appellant must establish that he is being held in custody in violation of the Constitution or laws or treaties of the United States. See 28 U.S.C. § 2241. Appellant asserts that the BOP's custody classifica-

227 Fed.Appx. 148, 2007 WL 1072969 (C.A.3 (N.J.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 227 Fed.Appx. 148, 2007 WL 1072969 (C.A.3 (N.J.)))**

tion for him violates the Due Process Clause and his rights under the Sixth Amendment.

Appellant first contends that the assignment of the public safety factor "greatest severity" is erroneous and has prevented him from being placed at a minimum security level. Because Appellant has no due process right to any particular security classification, *see Moody v. Daggett,* 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976), federal habeas relief is unavailable.

**\*\*2** [3] Appellant also asserts a violation of his rights under the Sixth Amendment, on the ground that the facts relied upon by the BOP in determining his classification pertain to a charge to which he did not plead guilty, apparently invoking the reasoning in such cases as *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). Such an argument is not available when, as here, the challenge is to the execution of a sentence, rather than the imposition of a sentence.

Accordingly, we will affirm the judgment of the District Court.

C.A.3 (N.J.),2007.
Marti v. Nash
227 Fed.Appx. 148, 2007 WL 1072969 (C.A.3 (N.J.))

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2007 WL 942091 (N.D.Tex.)
**(Cite as: 2007 WL 942091 (N.D.Tex.))**

▷

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas,
Dallas Division.
Robert L. MIHAILOVICH, Petitioner,
v.
David BERKEBILE, Warden of FCI Seagoville, FN1 Respondent.

> FN1. Consistent with this Order, the Court directs the Clerk of the Court to substituted David Berkebile, Warden of FCI Seagoville, as respondent for the Federal Bureau of Prisons.

No. 3:06-CV-1603-N ECF.
March 28, 2007.

Robert L. Mihailovich, Seagoville, TX, pro se.

Susan L.S. Ernst, US Attorney's Office, Dallas, TX, for Respondent.

### *ORDER ACCEPTING FINDINGS AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE*

DAVID C. GODBEY, United States District Judge.

**\*1** After reviewing all relevant matters of record in this case, including the Findings, Conclusions, and Recommendation of the United States Magistrate Judge and any objections thereto, in accordance with 28 U.S.C. § 636(b)(1), the undersigned District Judge is of the opinion that the Findings and Conclusions of the Magistrate Judge are correct and they are accepted as the Findings and Conclusions of the Court.

For the reasons stated in the Findings and Recommendation of the Magistrate Judge, the Court **DENIES** respondent's motion to dismiss and **GRANTS** petitioner's federal petition for writ of habeas corpus to the extent petitioner seeks to in-

validate 28 C.F.R. §§ 570.20 and 570.21. The Court hereby **SUBSTITUTES** David Berkebile, Warden of FCI Seagoville, as respondent for the Federal Bureau of Prisons. Unless the Bureau of Prisons considers in good faith whether petitioner should be transferred to a CCC considering the five factors set out in § 3621(b) without regard for §§ 570.20 and 570.21, and reports such results to the Court **21 (Twenty-One)** days from the date of this order, the Court will order respondent to release petitioner to an appropriate halfway house. By separate document, the Court will enter judgment consistent with this Order and the Findings and Recommendation of the Magistrate Judge.

### *FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE*

IRMA CARRILLO RAMIREZ, United States Magistrate Jude.

Pursuant to the provisions of 28 U.S.C. § 636(b), and an Order of the Court in implementation thereof, subject cause has previously been referred to the United States Magistrate Judge. The findings, conclusions, and recommendation of the Magistrate Judge are as follows:

### I. BACKGROUND FN1

> FN1. The background section is taken from various filings in this action, as well as taking judicial notice of proceedings and filings in *United States v. Mihailovich,* No. 3:05-CR-0067-N (N.D.Tex.), petitioner's federal criminal action that resulted in his federal incarceration.

Petitioner, a federal prisoner currently incarcerated in Seagoville, Texas, purports to bring this habeas action pursuant to 28 U.S.C. § 2241, and names the Federal Bureau of Prisons (BOP) as respondent.

Petitioner is serving a twenty-one month sen-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 942091 (N.D.Tex.)
**(Cite as: 2007 WL 942091 (N.D.Tex.))**

tence for mail fraud and aiding and abetting. He has a current projected good conduct release date of June 27, 2007. The BOP has denied petitioner's request for placement in a halfway house or Community Correction Center (CCC).FN2 It has indicated that petitioner has a pre-release preparation date of May 4, 2007, the earliest date petitioner would be permitted to transfer to a RRC under regulations implemented in February 2005.

>    FN2. Respondent informs the Court and petitioner that, as of March 31, 2006, the BOP refers to halfway houses which were formerly titled "Community Corrections Centers" as "Residential Reentry Centers" (RRCs). Because much of the authority cited herein refers to halfway houses or CCCs, these terms will be used interchangeably with RRCs.

Petitioner contends that he has twice pursued administrative remedies regarding his claims to no avail. According to petitioner, he commenced his most recent pursuit on August 8, 2006, by requesting that the BOP consider his request for placement in a RRC or in home confinement. On that same date, his request was denied in light of a December 13, 2002 memorandum from the Office of Legal Counsel, which stated that a prior practice of transferring an offender to a non-prison site was unlawful. Later in August 2006, petitioner filed a Request for Administrative Remedy that was denied by the Warden of FCI Seagoville on September 7, 2006, based upon the December 2002 memorandum. In September 2006, petitioner filed a Regional Office Administrative Remedy Appeal, which the Regional Director denied on October 4, 2006; petitioner was informed that May 4, 2007, was the earliest date he would be "permitted to transfer to a Residential Reentry Center." Petitioner thereafter filed a Central Office Administrative Remedy Appeal, which was denied on December 12, 2006, based upon 28 C.F.R. § 570.21.FN3

>    FN3. Respondent provides no rationale for the prior reliance on the December 2002

memorandum in light of the regulations implemented in February 2005 and codified in 28 C.F.R. § 570.21.

**\*2** Prior to the resolution of petitioner's most recent attempt to exhaust his administrative remedies, petitioner filed the instant action on August 24, 2006, when he placed his petition in the prison mail system with prepaid postage for delivery to this Court. Pursuant to 28 U.S.C. § 2241, petitioner challenges the manner in which his sentence is being executed by the BOP based upon the BOP's stance regarding placement in a RRC. He argues that "the BOP had, and continues to have, the obligation under U.S. law, to consider [him] for community confinement and/or home confinement both currently and at the time of his placement into BOP custody." He emphasizes that he "is not challenging the condition of his sentencing but rather the execution of his sentencing", and thus argues that § 2241 provides the proper vehicle for his claims. He contends that the BOP has violated 18 U.S.C. § 3621(b) by following regulations regarding its "categorical exercise of discretion for designating inmates to community confinement" that were struck down as illegal and subversive to congressional intent in *Woodall v. Federal Bureau of Prisons,* 432 F.3d 235 (3d Cir.2005) and *Fults v. Sanders,* 442 F.3d 1088 (8th Cir.2006). He prays that the Court will restore his "right to a lawful 'sentencing execution' " by ordering the BOP to comply with 18 U.S.C. § 3621(b) by placing him "into home confinement and/or community custody."

On December 28, 2006, respondent filed a motion to dismiss this action and argues that (1) petitioner has named an improper respondent; (2) the Court lacks jurisdiction under § 2241 because petitioner has not exhausted his administrative remedies;FN4 and (3) petitioner fails to state a claim upon which relief may be granted because the BOP's new regulations implemented on February 14, 2005, *i.e.,* 28 C.F.R. Part 570, codify the BOP's categorical exercise of discretion in decision re-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 942091 (N.D.Tex.)
**(Cite as: 2007 WL 942091 (N.D.Tex.))**

garding placement in halfway houses.

> FN4. In its motion to dismiss, respondent concedes that jurisdiction lies under 28 U.S.C. § 2241 by stating: "As the petitioner is challenging the BOP's policy regarding placement of inmates into halfway houses, he is thereby challenging the place of confinement. Therefore, the court has jurisdiction pursuant to § 2241."

On January 8, 2007, the Court received petitioner's response to the motion to dismiss. On January 22, 2007, respondent filed a reply to petitioner's response. Although respondent had previously conceded that petitioner properly pursues this action pursuant to 28 U.S.C. § 2241, respondent reversed its position in its reply brief and argued that the Court lacks jurisdiction under § 2241 because petitioner is not challenging the fact or duration of his custody but is instead challenging where he should serve his sentence. On February 2, 2007, the Court received petitioner's response to that reply. FN5

> FN5. For ease of reference, the Court will refer to petitioner's response as a sur-reply.

In light of respondent's new argument that this action is not properly brought pursuant to 28 U.S.C. § 2241, the Court first considers the nature of this action.

## II. NATURE OF ACTION

Petitioner commenced this action by filing a pleading entitled "Motion to Correct the Execution of Sentence Pursuant to 28 U.S.C. § 2241" to challenge the BOP's initial denial of placement in a RRC or home confinement as well as the BOP's subsequent denials to place him in a RRC or home confinement based on a federal policy. He also paid the $5 filing fee associated with habeas actions. Although respondent initially conceded in its motion to dismiss that jurisdiction lies under § 2241, in its reply to petitioner's response to that motion, it argues that § 2241 provides no jurisdictional basis for this action because petitioner is challenging where

he should serve his sentence, not the fact or duration of his custody. FN6

> FN6. Respondent's arguments track this Court's unpublished discussion in *Aguilar v. Joslin,* No. 3:05-CV-0679-N (N.D. Tex. Jul 20, 2005) (Findings, Conclusions, and Recommendation (FCR) accepted by the District Court), regarding whether this type of challenge is properly brought as a habeas action. In *Aguilar,* this Court recognized (1) a circuit and intra-district split "regarding what type of action a prisoner should file to contest 'his CCC placement' "; (2) the absence of a Fifth Circuit pronouncement regarding the issue in the context of CCC placement; and (3) a bright-line rule espoused in *Carson v. Johnson,* 112 F.3d 818 (5th Cir.1997) for determining whether an action is a habeas action or a civil action under 42 U.S.C. § 1983. *Aguilar,* No. 3:05-CV-0679-N (FCR at 1-2). The Court ultimately "decline[d] to fully consider whether *Carson* supported construing the "action as a civil action that is subject to the Prison Litigation Reform Act (PLRA)" because the issues raised by *Aguilar* were moot in light of changes to the relevant BOP policy which became effective in February 2005. *Id.* (FCR at 3-9 (noting that petitioner challenged only the policy which became effective in December 2002)).

**\*3** In his response to the argument that this action is not properly brought pursuant to 28 U.S.C. § 2241, petitioner argues that he is in custody in violation of 18 U.S.C. § 3621(b), that he may proceed under § 2241 to challenge the execution of his sentence, and that respondent misrepresents *Carson.* However, § 3621(b) merely provides authority to the BOP to designate the place of imprisonment for federal prisoners; it has no bearing on the validity or length of petitioner's custody unless the Court narrowly construes custody to exclude pre-release

custody in a halfway house. For purposes of habeas relief, "custody" is broadly construed and includes release on parole. *See Maleng v. Cook,* 490 U.S. 488, 490-91, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989). A prisoner is certainly in custody within the meaning of the habeas statutes whether he is physically incarcerated in a federal prison facility or in a halfway house.[FN7]

> FN7. In fact, the Fifth Circuit recently found that an individual who resides in a halfway house as a condition of his release to mandatory supervision under Texas law is a "prisoner" within the meaning of the PLRA. *See Jackson v. Johnson,* 475 F.3d 261 (5th Cir.2007). *Jackson* provides additional support for finding that placement in a halfway house does not constitute a release from custody, but rather, a change in custody.

Nevertheless, it is well-established that federal prisoners may challenge the execution of their sentences via § 2241. *See, e.g., Leggett v. Fleming,* 380 F.3d 232, 234 (5th Cir.2004) (time credit issues); *Warren v. Miles,* 230 F.3d 688, 694 (5th Cir.2000) (early release consideration); *United States v. Cleto,* 956 F.2d 83, 84 (5th Cir.1992) (time credit issue). Several circuits have indicated that § 2241 provides a proper vehicle for considering where a federal sentence should be served. *See, e.g., Levine v. Apker,* 455 F.3d 71, 77-78 (2d Cir.2006); *Woodall v. Federal Bureau of Prisons,* 432 F.3d 235, 242-44 (3d Cir.2005) (finding that a challenge to BOP regulations governing placement in a CCC is a proper challenge to the execution of the inmate's sentence and is therefore properly brought pursuant to § 2241); *United States v. Jalili,* 925 F.2d 889, 893 (6th Cir.1991) (holding that challenge to place of imprisonment, not fact of federal conviction, properly brought under § 2241); *Hernandez v. Campbell,* 204 F.3d 861, 864 (9th Cir.2000) (holding that challenges to the "manner, location, or conditions of a sentence's execution must be brought pursuant to § 2241"). One court in this district has also so

held. *See United States v. Wooderts,* No. 3:97-CR-0054-D, 2007 WL 549406, at *1 (N.D.Tex. Feb.21, 2007) (Findings, Conclusions, and Recommendation accepted by District Court, which notes that § 2241 provides the proper vehicle for challenges to the execution of a federal sentence, such as challenging a failure "to consider and/or designate the state prison as a place of confinement for his federal sentence" and challenging whether the federal sentence should run concurrently with a state sentence).

"[T]he precise meaning of 'execution of the sentence' is hazy." *Woodall,* 432 F.3d at 242. The line between a habeas case and a typical civil action is likewise "hazy". *See Richmond v. Scibana,* 387 F.3d 602, 605-06 (7th Cir.2004). In *Carson v. Johnson,* 112 F.3d 818 (5th Cir.1997), the Fifth Circuit endeavored to eliminate the haziness in this circuit between habeas and § 1983 actions by setting out a bright-line rule for determining the proper basis for a given action:

**\*4** Generally, § 1983 suits are the proper vehicle to attack unconstitutional conditions of confinement and prison procedures. A habeas petition, on the other hand, is the proper vehicle to seek release from custody.

The distinction is blurry, however, when, as here, a prisoner challenges an unconstitutional condition of confinement or prison procedure that affects the timing of his release from custody. We have adopted a simple, bright-line rule for resolving such questions. If "a favorable determination ... would not automatically entitle [the prisoner] to accelerated release," the proper vehicle is a § 1983 suit.

112 F.3d at 820-21 (citations omitted).

Under *Carson,* the instant action appears to be a non-habeas case because it does not automatically entitle petitioner to accelerated release from custody-it merely changes the nature of petitioner's custody. Notwithstanding the bright-line rule set

Not Reported in F.Supp.2d, 2007 WL 942091 (N.D.Tex.)
**(Cite as: 2007 WL 942091 (N.D.Tex.))**

forth in *Carson,* the Fifth Circuit recently affirmed the dismissal of a § 2241 petition which alleged a constitutional violation stemming from the BOP's designation of a CCC for service of the last ten percent of the sentence instead of home confinement. *See Sonnier v. Francis,* No. 06-20112, 2007 WL 509544, at *1 (5th Cir. Feb.14, 2007) (per curiam). *Sonnier* did not address a challenge to the validity of the BOP's policy regarding placement in a halfway house and nor the propriety of pursuing the claims pursuant to § 2241, however.

Furthermore, *Carson* dealt with a state prisoner who could pursue his claims pursuant to 42 U.S.C. § 1983. Here, petitioner is a federal prisoner who has no recourse to § 1983 for his claims. Although the federal counterpart to § 1983 lies with a claim under *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), a *Bivens* action does not lie against the BOP or the federal government. *See Chimney v. United States,* No. 4:05-CV-261-Y, 2005 WL 2219259, at *2 (N.D.Tex. Sept.9, 2005). Although the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.,* may provide a proper basis for a civil action in some circumstances, *see Richmond v. Scibana,* 387 F.3d 602, 605-606 (7th Cir.2004) (discussing when a claim may arise under the APA), it provides no basis for challenging decisions made pursuant to 18 U.S.C. § 3621(b), *see* 18 U.S.C. § 3625 (specifically stating that the APA is inapplicable "to the making of any determination, decision, or order under this subchapter", *i.e.,* §§ 3621-26); *Chimney,* 2005 WL 2219259, at *2. Finally, as noted in *Woodall,* confinement in a traditional federal prison is "qualitatively different" from community confinement, and thus justifies utilization of § 2241 for challenging BOP regulations regarding placement in a CCC. 432 F.3d at 243-44. In light of *Sonnier,* the other cited cases, the facts of *Carson,* and petitioner's lack of recourse, the Court finds that petitioner properly invoked jurisdiction under § 2241.[FN8]

> FN8. The Court notes that were this action

to proceed as a civil action, venue would most likely lie in this Court because petitioner is currently incarcerated in a federal prison within the territorial confines of this Court, and the alleged denials of release to a RRC occurred while he was incarcerated there.

## III. PROPER RESPONDENT

**\*5** The named respondent in this action, the Federal Bureau of Prisons, submits that David Berkebile, Warden of FCI Seagoville, is the proper respondent for this action filed pursuant to 28 U.S.C. § 2241. Section 2242 of Title 28 of the United States Code requires an application for writ of habeas corpus to name the petitioner's custodian as respondent. In this instance, petitioner's immediate custodian is the Warden of FCI Seagoville. The Warden of petitioner's place of incarceration is the proper respondent for this § 2241 action. *See Rumsfeld v. Padilla,* 542 U.S. 426, 434-42, 124 S.Ct. 2711, 159 L.Ed.2d 513 (2004); *Moreland v. Federal Bureau of Prisons,* 431 F.3d 180, 183 n. 6 (5th Cir.2005), *cert. denied,* --- U.S. ----, 126 S.Ct. 1906, 164 L.Ed.2d 583 (2006). Accordingly, if the District Court agrees that this action properly proceeds pursuant to 28 U.S.C. § 2241, it should substitute David Berkebile as respondent for the Federal Bureau of Prisons.

## IV. EXHAUSTION

Respondent argues that this Court lacks jurisdiction over this action, even if properly brought pursuant to § 2241, because petitioner has failed to exhaust his administrative remedies. It argues in its motion to dismiss that petitioner did not exhaust all available administrative remedies prior to filing the instant action because he filed the action prior to obtaining a response to his Request for Administrative Remedy, and as of the date petitioner filed the instant action, he had not exhausted either of the two required appeals.

In his response to the motion to dismiss, petitioner points out that he had previously exhausted his administrative remedies, and was merely giving

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

the BOP a second chance to grant his request for release to a RRC or home confinement. He argues, furthermore, that this action is not subject to the exhaustion requirement because he is not challenging the conditions of his confinement in a civil action to which 42 U.S.C. § 1997e applies.

In its reply to petitioner's response, respondent urges the Court to dismiss this action because petitioner concedes that he did not exhaust his administrative remedies prior to filing this action. In his sur-reply, petitioner argues that no exhaustion doctrine requires him to exhaust his administrative remedies twice and further argues that respondent has failed to adequately support its exhaustion defense as required by *Jones v. Brock,* ---U.S. ----, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).

Although petitioner correctly argues that petitions under 28 U.S.C. § 2241 are not subject to the statutory requirement of exhaustion of remedies applicable to civil actions in which a prisoner challenges the conditions of his or her confinement, *i.e.,* 42 U.S.C. § 1997e, that fact has no bearing on the exhaustion requirements for § 2241. Such requirements do not arise from statute, but from federal case law. Under such case law, it is well-established that petitioners seeking relief under § 2241 generally must exhaust their administrative remedies prior to presenting their claims in federal court. *See Fuller v. Rich,* 11 F.3d 61, 62 (5th Cir.1994) (addressing exhaustion in context of a § 2241 challenge by a federal prisoner of a parole decision); *Crumps v. Bureau of Prisons,* No. 1:05-CV-775, 2006 WL 2524102, at *2 (E.D.Tex. Aug. 30, 2006) (report and recommendation adopted by District Court which addressed exhaustion in context of § 2241 action seeking release to a halfway house for last six months of federal sentence); *Martinez v. Childress,* No. 1:05-CV-850, 2006 WL 1804603, at *2 (E.D.Tex. June 28, 2006) (same). Federal prisoners who present a claim under § 2241 should exhaust the remedies provided by the BOP. *See, e.g., United States v. Gabor,* 905 F.2d 76, 78 n. 2 (5th Cir.1990) (time credit issue);

*Crumps,* 2006 WL 2524102, at *2.

**\*6** Sections 542.10 through 542.19 of Title 28 of the Code of Federal Regulations set out the BOP administrative procedure for inmates who seek formal review of their complaints. Pursuant to this procedure inmates may "seek formal review of an issue which relates to any aspect of [their] confinement." 28 C.F.R. § 542.10. The process generally commences by "present[ing] an issue of concern informally to staff." *Id.* § 542.13. If the inmate is unsatisfied with the informal resolution, he "submits a Request for Administrative Remedy" to commence the formal portion of the administrative process. *Id.* Such request generally must be filed within twenty "calendar days following the date on which the basis for the Request occurred." *Id.* § 542.14(a). Within twenty days of the filing of such a formal request, the Warden generally issues a formal response.[FN9] *Id.* § 542.18. "An inmate who is not satisfied with the Warden's response may submit an Appeal on the appropriate form (BP-10) to the appropriate Regional Director within 20 calendar days of the date the Warden signed the response." *Id.* § 542.15(a). [FN10] The Regional Director generally issues a formal response within thirty calendar days. *Id.* § 542.18. "An inmate who is not satisfied with the Regional Director's response may submit an Appeal on the appropriate form (BP-11) to the General Counsel within 30 calendar days of the date the Regional Director signed the response." *Id.* § 542.15(a). General Counsel generally issues a final response within forty calendar days. *Id.* § 542.18. "Appeal to the General Counsel is the final administrative appeal." *Id.* § 542.15(a). Upon completing this multiple-tiered review process, federal inmates have exhausted their administrative remedies required for filing a § 2241 petition.

> FN9. The response times set forth in § 542.18 are subject to being shortened for emergency cases and lengthened if the response time is deemed "insufficient to make an appropriate decision." *See* 28 C.F.R. § 542.18. In addition, "[i]f the in-

mate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level." *Id.*

FN10. Upon demonstration of "a valid reason for delay," the time limits of § 542.15(a) "may be extended." *See* 28 C.F.R. § 542.15(a).

Although prisoners generally must exhaust their administrative remedies prior to filing a § 2241 action, exhaustion of such remedies is not a jurisdictional requirement. *See Hager v. United States Atty. Gen.,* No. 3:04-CV-40-M, 2004 WL 691578, at *1 (N.D.Tex. Mar.26, 2004), *accepted by* unpub. order (N.D.Tex. Apr. 14, 2004). "Non-jurisdictional exhaustion serves three functions: 'giving agencies the opportunity to correct their own errors, affording parties and courts the benefits of agencies' expertise, [and] compiling a record adequate for judicial review[.]' " *Avocados Plus Inc. v. Veneman,* 370 F.3d 1243, 1247 (D.C.Cir.2004). "Unlike jurisdictional exhaustion requirements, which the Court may not excuse, a ... failure to fulfill a non-jurisdictional exhaustion requirement need not be fatal to [an action]." *Holmes v. PHI Service Co.,* 437 F.Supp.2d 110, 123 (D.D.C.2006) (citation omitted). In the habeas context, moreover, the Supreme Court has indicated that the district courts have discretion to stay a habeas action so that the petitioner may fully exhaust state remedies. *Pace v. DiGuglielmo,* 544 U.S. 408, 416, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005); *Rhines v. Weber,* 544 U.S. 269, 278-79, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005). The Supreme Court has thus at least implicitly agreed that subsequently exhausting available remedies cures an initial lack of exhaustion in the habeas context.

**\*7** In this instance, petitioner argues that he exhausted available administrative remedies prior to filing this action and respondent must show that he did not exhaust. Because petitioner undoubtedly exhausted all administrative remedies as of December

2006, and because the Court finds that such exhaustion would cure any failure to exhaust prior to filing this action, the Court need not definitively determine whether petitioner had indeed exhausted all available administrative remedies prior to commencing this action in August 2006 or whether respondent bears the burden to show a failure to exhaust. To the extent petitioner had not exhausted all available remedies prior to filing this action, his subsequent exhaustion cures that failure. The Court thus proceeds to the merits of petitioner's claims.

**V. PETITIONER'S CLAIMS**

Petitioner challenges the BOP's continued denials to place him in a RRC or home confinement.

Congress has enacted two statutory provisions relevant to the place of incarceration for federal inmates. Section 3621(b) of Title 18 of the United States Code mandates that the BOP "shall designate the place of imprisonment." In addition to that mandatory component, the statute provides discretion to the BOP to "designate any available penal or correctional facility ... considering" five enumerated factors: (1) the resources of the contemplated facility; (2) offense-specific information; (3) prisoner-specific information; (4) statements of the sentencing court; and (5) pertinent policy statements. *See* 18 U.S.C. § 3621(b). Furthermore, the BOP "may at any time, having regard for the same matters, direct the transfer of a prisoner from one penal or correctional facility to another." *Id.* Although the statute does not define "penal or correctional facility," no one disputes that a RRC or halfway house qualifies. FN11 Conversely, home confinement would certainly not qualify. *See Crowley v. Federal Bureau of Prisons,* 312 F.Supp.2d 453, 461 (S.D.N.Y.2004) (noting that BOP Program Statement 7310.01 excludes "home confinement" from the definition of "penal or correctional facility"); *United States v. Morales-Morales,* 985 F.Supp. 229, 231 (D.P.R.1997) (same).

FN11. For an overview of why a RRC qualifies as a correctional facility see *Levine v. Apker,* 455 F.3d 71, 82 n. 8 (2d

Cir.2006).

In addition to § 3621(b), which governs the initial designation of the place of imprisonment as well as any subsequent transfers to a different penal or correctional facility, Congress provided for pre-release custody in § 3624(c). That statute provides in pertinent part:

The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 per centum of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement.

**\*8** In 1995, the BOP established a "policy and procedures for referral and placement of pre-release inmates in Community Corrections home confinement programs." (*See* Program Statement 7320.01, *Home Confinement* (Sept. 6, 1995), attached as Ex. C to Mot. Dismiss.) According to Program Statement 7320.01:

The Bureau does **not** have statutory authority to designate a home confinement program for an inmate at the beginning of his or her sentence. This is supported in Title 18, U.S.C., Section 3621, which requires that the Bureau designate any available **penal or correctional** facility as the place of a prisoner's imprisonment.

(*Id.* ¶ 1.) "All inmates referred to community corrections are eligible to be considered for home confinement placement." (*Id.* ¶ 6 (eligibility for home confinement).) In addition, although the BOP provides CCC "services for persons as a condition of probation, parole, or supervised release, only in the most extraordinary circumstances will the Bureau assume responsibility for such persons on home confinement." (*Id.*) The Policy Statement also provides for placement on home confinement fol-

lowing CCC placement and directly from an institution in appropriate circumstances. (*Id.* ¶¶ 11-12.)

Additionally, prior to December 2002, the BOP considered all federal inmates, regardless of the length of their sentence, to be eligible for a six-month maximum placement at a CCC for the end of their sentences, even if such placement exceeded ten percent of the inmate's sentence. *See* BOP Program Statement 7310.04, *Community Corrections Center (CCC) Utilization and Transfer Procedure* (Dec. 16, 1998). However, in December 2002, the BOP changed its practice and began restricting CCC placements to the final ten percent of an inmate's term of imprisonment, not to exceed six months.

"The December 2002 Policy spawned numerous legal challenges from inmates who previously would have been eligible for CCC placement at any time during their incarceration, including the last six months." *Pimentel v. Gonzales,* 367 F.Supp.2d 365, 367 (E.D.N.Y.2005) (collecting cases). Consequently, in August 2004, the BOP proposed new regulations to govern CCC placement decisions and, after receiving public comment, the BOP published a new rule on January 10, 2005. *Id.* at 368-69. The new regulations became effective on February 14, 2005, and are codified at 28 C.F.R. §§ 570.20 and 570.21. Section 570.20 addresses the purpose of the regulations:

(a) This subpart provides the Bureau of Prisons' (Bureau) categorical exercise of discretion for designating inmates to community confinement. The Bureau designates inmates to community confinement only as part of the pre-release custody and pro-gramming which will afford the prisoner a reasonable opportunity to adjust to and prepare for re-entry into the community.

As discussed in this subpart, the term "community confinement" includes Community Corrections Centers (CCC) (also known as "halfway houses") and home confinement.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 942091 (N.D.Tex.)
**(Cite as: 2007 WL 942091 (N.D.Tex.))**

**\*9** Section 570.21 addresses the timing of CCC designations:

(a) The Bureau will designate inmates to community confinement only as part of pre-release custody and programming, during the last ten percent of the prison sentence being served, not to exceed six months.

(b) We may exceed these time frames only when specific Bureau programs allow greater periods of community confinement, as provided by separate statutory authority (for example, residential substance abuse treatment program (18 U.S.C. 3621(e)(2)(A), or shock incarceration program (18 U.S.C. 4046(c)).

In light of these statutory provisions and relevant regulations and program statements, the Court considers petitioner's challenges the denials to place him in a RRC or home confinement.

**A. Placement in a CCC**

Petitioner challenges the February 2005 regulations regarding his placement in a RRC. Respondent argues that (1) § 3621(b) only authorizes consideration of the enumerated factors when it has elected to consider whether to transfer a prisoner; (2) the February 2005 regulations are entitled to deference under *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); (3) the Supreme Court has already upheld the BOP's categorical exercise of discretion in a different context in *Lopez v. Davis,* 531 U.S. 230, 121 S.Ct. 714, 148 L.Ed.2d 635 (2001); (4) the February 2005 regulations do not conflict with congressional intent as revealed through the relevant legislative history of § 3621; and (5) the § 3621(b) factors are discretionary.

Four courts of appeal have considered the validity of the 2005 regulations, and each has invalidated them because the regulations preclude consideration of all factors enumerated in 18 U.S.C. § 3621(b). *See Wedelstedt v. Wiley,* --- F.3d ----, ----, No. 06-1461, 477 F.3d 1160, 2007 WL 512517, at \*1-7 (10th Cir. Feb.20, 2007); *Levine v. Apker,* 455

F.3d 71, 85-87 (2d Cir.2006); *Fults v. Sanders,* 442 F.3d 1088, 1092 (8th Cir.2006); *Woodall v. Federal Bureau of Prisons,* 432 F.3d 235, 246 (3d Cir.2005). With *Woodall,* the Third Circuit became the first court of appeals to address the validity of the 2005 regulations. *See* 432 F.3d at 244. It noted that the district courts were divided, but agreed with "the reasoning of those courts that have found the regulations unlawful." *Id.* It held:

The regulations do not allow the BOP to consider the nature and circumstances of an inmate's offense, his or her history and pertinent characteristics, or most importantly, any statement by the sentencing court concerning a placement recommendation and the purposes for the sentence. And yet, according to the text and history of § 3621, these factors must be taken into account. The regulations are invalid because the BOP may not categorically remove its ability to consider the explicit factors set forth by Congress in § 3621(b) for making placement and transfer determinations.

*Id.* In making such holding, the Third Circuit specifically rejected the same five arguments that respondent makes in this case. *See id.* at 244-50. In *Fults, Levine,* and *Wedelstedt,* the Eighth, Second, and Tenth Circuits respectively followed the rationale of the majority opinion in *Woodall. See Wedelstedt,* 477 F.3d 1160, 2007 WL 512517, at \*1; *Levine,* 455 F.3d at 87; *Fults,* 442 F.3d at 1091-92.

**\*10** Although there is unanimity within the circuits that have addressed the validity of the February 2005 regulations, each case lacked unanimity within the panel of appellate judges for different reasons. *See Wedelstedt,* 477 F.3d 1160, 2007 WL 512517, at \*8-10 (Hartz, Circuit Judge, dissenting because he did not consider the five factors set forth in § 3621(b) to be mandatorily required to be considered in every case); *Levine,* 455 F.3d at 87-91 (Raggi, Circuit Judge, dissenting based on a construction of the February 2005 regulations "as a permissible categorical rejection of CCCs as appro-

priate and suitable facilities for § 3621(b) designa-tions generally, with a limited exception only for those circumstances where Congress has identified statutory considerations pursuant to 18 U.S.C. §§ 3621(e)(2)(A), 3624(c), or 4046(c), in addition to those catalogued in § 3621(b)"); *Fults,* 442 F.3d at 1093 (Riley, Circuit Judge, dissenting for same reasons as dissent in *Woodall); Woodall,* 432 F.3d at 251-52 (Fuentes, Circuit Judge dissenting be-cause "the § 3621(b) factors need not be considered by the BOP until an inmate is actually considered for a transfer, and [ ] the BOP is not required to consider any inmate for transfer to a CCC until the lesser of six months or ten percent of an inmate's sentence remains").

The Court finds the majority opinions in *Woodall, Fults, Levine,* and *Wedelstedt* more per-suasive. Section 3621(b) governs the initial place-ment of a federal prisoner in BOP-designated place of imprisonment. It also governs the transfer of a federal prisoner to any other penal or correctional facility regardless of when such transfer decision is made. In both initial placement and transfer de-cisions, the five factors must be considered, and three of them require individual consideration. So long as a RRC or halfway house is encompassed within the phrase, "penal or correctional facility", § 3621(b) guides the BOP in exercising its discretion to designate the precise place of imprisonment. As found in *Woodall, Fults, Levine,* and *Wedelstedt,* the February 2005 regulations, *i.e.,* 28 C.F.R. §§ 570.20 and 570.21, are invalid because they do not permit the BOP to consider CCC placement prior to the last ten percent of his sentence. "However, that the BOP may assign a prisoner to a CCC does not mean that it must." *Woodall,* 432 F.3d at 251. Con-sequently, the appropriate remedy in this case is an order requiring the BOP to consider in good faith whether petitioner should be transferred to a RRC considering the five factors set out in § 3621(b) without regard for §§ 570.20 and 570.21. *See id.; Wedelstedt,* 477 F.3d 1160, 2007 WL 512517, at *8 .

**B. *Placement in Home Confinement***

Petitioner also challenges the BOP's continued denials to place him in home confinement. However, because home confinement falls outside the boundaries of a "penal or correctional facility", § 3621(b) provides no statutory authority for the BOP to designate home confinement as a place of imprisonment. By specifically stating that "[t]he authority provided by this subsection may be used to place a prisoner in home confinement", § 3624(c) implies that the BOP otherwise has no au-thority to place a prisoner in home confinement. Program Statement 7320.01 supports such implica-tion or inference. Until petitioner is within the last ten percent of his sentence, not to exceed six months, § 3624(c) provides no basis for placement in home confinement. Because petitioner has not reached that point in his federal sentence, the BOP properly denied him release to home confinement without consideration of the factors in § 3621(b) re-gardless of the February 2005 regulations.

## VI. RECOMMENDATION

**\*11** For the foregoing reasons, the undersigned Magistrate Judge **RECOMMENDS** that the Dis-trict Court **DENY** respondent's motion to dismiss and **GRANT** petitioner's federal petition for writ of habeas corpus to the extent petitioner seeks to in-validate 28 C.F.R. §§ 570.20 and 570.21. The Court should substitute David Berkebile as respondent for the Federal Bureau of Prisons, and order him to re-lease petitioner to an appropriate halfway house, unless the Bureau of Prisons considers in good faith whether petitioner should be transferred to a RRC considering the five factors set out in § 3621(b) without regard for §§ 570.20 and 570.21. The Court should require that the BOP conduct such consider-ation and report the results to the Court within a precise date specified by the Court after reviewing filed objections, if any, to this recommendation.

**SIGNED this 19th day of March, 2007.**

N.D.Tex.,2007.
Mihailovich v. Berkebile
Not Reported in F.Supp.2d, 2007 WL 942091

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 942091 (N.D.Tex.)
**(Cite as: 2007 WL 942091 (N.D.Tex.))**

(N.D.Tex.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 4999017 (N.D.Tex.)
**(Cite as: 2008 WL 4999017 (N.D.Tex.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas,
Dallas Division.
Tobias Terrell SEASTRONG,
v.
D. BERKEBILE, Respondent.

No. 3:08-CV-1853-M ECF.
Nov. 24, 2008.

West KeySummary**Habeas Corpus 197** 🔑231

197 Habeas Corpus
   197I In General
     197I(A) In General
       197I(A)2 Necessity and Effect of Writ;
Mootness and Prematurity
        197k231 k. Prison Conditions, Management, or Discipline; Good Time Credits. Most Cited Cases

Federal inmate, who asserted various challenges related to the calculation of his sentence credit for his federal conviction for possession of a firearm in furtherance of a drug trafficking crime, did not properly exhaust his Bureau of Prisons (BOP) administrative remedies and, therefore, his claim for habeas relief was premature. The inmate received written notification that additional time was needed to respond to his claim, but disregarded the proper extension of time and prematurely filed his habeas action. He did not show that his case involved extraordinary circumstances where an exception to exhaustion should apply. 28 U.S.C.A. § 2241; 28 C.F.R. § 542.18.

Tobias Terrell Seastrong, Seagoville, TX, pro se.

***ORDER ACCEPTING FINDINGS AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE***

BARBARA M.G. LYNN, District Judge.

**\*1** After reviewing the Findings, Conclusions, and Recommendation of the United States Magistrate Judge for plain error, I am of the opinion that the Findings and Conclusions of the Magistrate Judge are correct and they are accepted as the Findings and Conclusions of the Court.

SO ORDERED.

***FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE***

IRMA CARRILLO RAMIREZ, United States Magistrate Judge.

Pursuant to the provisions of 28 U.S.C. § 636(b), and an Order of the Court in implementation thereof, subject cause has previously been referred to the United States Magistrate Judge. The findings, conclusions, and recommendation of the Magistrate Judge are as follows:

**I. BACKGROUND**[FN1]

> FN1. The background information is taken from petitioner's federal petition for writ of habeas corpus.

Petitioner, a prisoner currently incarcerated in the Federal Correctional Institution located in Seagoville, Texas, brings this habeas action pursuant to 28 U.S.C. § 2241. David Berkebile, Warden of FCI Seagoville, is the proper respondent.

The Court received the instant petition filed pursuant to 28 U.S.C. § 2241 on October 17, 2008. Petitioner asserts various challenges related to the calculation of his sentence credit for his federal conviction for possession of a firearm in furtherance of a drug trafficking crime. He contends that he has exhausted available administrative remedies because he has received no timely response at the third step of the formal administrative process.

**II. EXHAUSTION**
**A. *Requirement of Exhaustion***

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4999017 (N.D.Tex.)
**(Cite as: 2008 WL 4999017 (N.D.Tex.))**

It is well-established that petitioners seeking relief under § 2241 generally must exhaust their administrative remedies prior to presenting their claims in federal court. *See Fuller v. Rich,* 11 F.3d 61, 62 (5th Cir.1994) (per curiam) (addressing exhaustion in context of a § 2241 challenge by a federal prisoner to a parole decision). Prisoners who challenge the calculation of their federal sentences should exhaust the remedies provided by the Bureau of Prisons (BOP). *See, e.g., United States v. Gabor,* 905 F.2d 76, 78 n. 2 (5th Cir.1990); *Sanchez v. Wendt,* No. 3:03-CV-1372-M, 2003 WL 22327877, at *1 (N.D.Tex. Oct.8, 2003) (recommendation of Mag. J.), *accepted by* 2003 WL 22961222 (N.D.Tex. Oct.27, 2003). Exhaustion under § 2241 requires that the petitioner "fairly present all of his claims" through appropriate channels prior to pursuing federal habeas relief. *Dickerson v. Louisiana,* 816 F.2d 220, 228 (5th Cir.1987) (addressing § 2241 filed by a state pre-trial detainee).

"Application of the [exhaustion] doctrine to specific cases requires an understanding of its purposes and of the particular administrative scheme involved." *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). "The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence-to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies." *Parisi v. Davidson,* 405 U.S. 34, 37, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972); *accord Willard v. Van Buren,* No. 4:04-CV-287-A, 2004 WL 994069, at *1 (N.D.Tex. Apr.30, 2004) ("The purpose of the exhaustion requirement is to permit the federal agency being challenged to correct its own error without court intervention."). Inmates who begin the administrative grievance process but voluntarily halt the process prematurely have not properly exhausted their administrative remedies, and substantial compliance with administrative procedures does not suffice to exhaust administrative remedies. *Wright v. Hollingsworth,* 260 F.3d 357, 358 (5th Cir.2001)

(civil action under 42 U.S.C. § 1983).

**\*2** The multi-tiered BOP administrative procedure for inmates who seek formal review of their complaints is set forth in 28 U.S.C. §§ 542.10-542.19. *Mihailovich,* 2007 WL 942091, at *6-7. BOP Program Statement 1330.13, *Administrative Remedy Program,* outlines the procedure and provides federal prisons relevant guidance regarding it. *Aguirre-Castillo v. United States,* No. 1:03-CV146-C, 2004 WL 594105, at *2 (N.D.Tex. Feb.26, 2004). Pursuant to this procedure inmates may "seek formal review of an issue which relates to any aspect of [their] confinement." 28 C.F.R. § 542.10. The administrative process involves an informal step which is often commenced with a BP-8 form as well as three formal steps which respectively require the filing of a BP-9, BP-10, or BP-11 form. *Id.* §§ 542.13, 542.14, 542.15, 542.18. The filing of a BP-11 appeal "is the final administrative appeal." *Id.* § 542.15(a). General Counsel typically respond to a filed BP-11 within forty days, but may extend that time by twenty days by informing the inmate of the extension in writing. *Id.* § 542.18. "If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level." *Id.* Upon completing this multiple-tiered review process, federal inmates have exhausted their administrative remedies required for filing a § 2241 petition.

In this case, petitioner attaches the responses he received to his BP-8, BP-9, and BP-10 submissions. He also attaches a written notice from the Administrative Remedy Coordinator Central Office which informed him that (1) his BP-11 was received August 20, 2008; (2) additional time was needed for a response; and (3) the response time was extended to October 19, 2008. The extension falls within the parameters of 28 C.F.R. § 542.18 because it merely extends the forty-day response time by twenty days as permitted under the regulation. Petitioner thus filed the instant action before exhausting his administrative remedies.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4999017 (N.D.Tex.)
**(Cite as: 2008 WL 4999017 (N.D.Tex.))**

**B. *Exceptions***

Although prisoners must generally exhaust their administrative remedies prior to filing a § 2241 action, *see Rourke v. Thompson,* 11 F.3d 47, 49 (5th Cir.1993); *Lundy v. Osborn,* 555 F.2d 534, 535 (5th Cir.1977) (per curiam), exhaustion in the § 2241 context is not a jurisdictional requirement and may be excused in appropriate circumstances, *see Mihailovich v. Berkebile,* No. 3:06-CV-1603-N, 2007 WL 942091, at *6 (N.D.Tex. March 28, 2007) (accepting recommendation of Mag. J.). Non-jurisdictional exhaustion requirements "may be subject to certain defenses such as waiver, estoppel or equitable tolling." *Wright v. Hollingsworth,* 260 F.3d 357, 358 n. 2 (5th Cir.2001). Furthermore, when "the available administrative remedies either are unavailable or wholly inappropriate to the relief sought, or where the attempt to exhaust such remedies would itself be a patently futile course of action", petitioners need not exhaust administrative remedies. *Fuller v. Rich,* 11 F.3d 61, 62 (5th Cir.1994) (per curiam) (citation omitted). Such exceptions to the exhaustion requirement "apply only in 'extraordinary circumstances,' and [petitioner] bears the burden of demonstrating the futility of administrative review." *Id.* (citations omitted). If a federal inmate carries his burden to demonstrate an applicable exception to the exhaustion requirement, such inmate may obtain a merits ruling on his § 2241 petition despite a lack of exhaustion. *See id.*

**\*3** In this case, petitioner makes no allegation that administrative remedies are either unavailable or wholly inappropriate to the relief sought, or that an attempt to exhaust such remedies would be futile. He has not shown that this case involves extraordinary circumstances where an exception to exhaustion applies. Although he had received written notification consistent with 28 C.F.R. § 542.18, he disregarded the proper extension of time, and prematurely filed this action. Consequently, the Court should dismiss this action without prejudice due to petitioner's failure to exhaust administrative remedies.

The Court recognizes that the written notice which extends the time to respond to petitioner's BP-11 indicates that a response would be rendered by October 19, 2008, a date that has passed since the filing of this action. Based upon 28 C.F.R. § 542.18, petitioner has exhausted his administrative remedies as of October 19, 2008, whether or not he received a response to his BP-11. That fact, however, does not (1) trump the general rule that § 2241 petitioners must exhaust their administrative remedies prior to filing a habeas action or (2) dispense with petitioner's burden to show circumstances which justify applying an exception to the general rule. To rule otherwise would eviscerate long-standing case law regarding exhaustion in the § 2241 context.[FN2]

> FN2. Of course, the federal courts have discretion to stay a habeas action so that a petitioner may fully exhaust available remedies. *See Pace v. DiGuglielmo,* 544 U.S. 408, 416, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005); *Rhines v. Weber,* 544 U.S. 269, 278-79, 125 S.Ct. 1528, 161 L.Ed.2d 440 (2005). While these cases implicitly indicate that exhausting available remedies after filing a habeas action may cure an initial lack of exhaustion, *see Mihailovich v. Berkebile,* No. 3:06-CV-1603-N, 2007 WL 942091, at *6 (N.D.Tex. March 28, 2007) (accepting recommendation of Mag. J.), they do not preclude dismissal of this action even if petitioner has subsequently exhausted his administrative remedies. *Rhines* recognizes that a stay is warranted to facilitate exhaustion "only in limited circumstances." *See* 544 U.S. at 277.

> In *Mihailovich* this Court implicitly found exceptional circumstances for permitting the case to proceed when the petitioner argued that he had already exhausted his administrative remedies once, had clearly exhausted the remedies during the pendency of the federal

habeas writ, was within three months of his projected release date, and raised a challenge to a denial for placement in a halfway house. *See* 2007 WL 942091, at *1, 5-7. In light of petitioner's argument that he was merely giving the prison a second chance to address his placement in a halfway house, the possibility existed that there was no exhaustion issue caused by the completion of the administrative process while the case was pending. In any event, Mihailovich had demonstrated good cause for permitting the habeas action to proceed even though the Court did not specifically address the matter in terms of good cause. Had the Court dismissed the petition without prejudice to its refiling, Mihailovich would have faced a delay which could have rendered his entire petition moot due to his rapidly approaching projected release date. Unlike *Mihailovich,* this case does not fall within the narrow circumstances set forth in *Rhines.*

### III. RECOMMENDATION

For the foregoing reasons, the undersigned Magistrate Judge **RECOMMENDS** that the Court **DISMISS** the instant petition filed pursuant to 28 U.S.C. § 2241 without prejudice for the failure of petitioner to exhaust administrative remedies.

**SIGNED this 1st day of November, 2008.**

N.D.Tex.,2008.
Seastrong v. Berkebile
Not Reported in F.Supp.2d, 2008 WL 4999017 (N.D.Tex.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 276206 (E.D.N.Y.)
**(Cite as: 2010 WL 276206 (E.D.N.Y.))**

**C**

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
E.D. New York.
Douglas STRONG, Petitioner,
v.
Harry LAPIN, Director of the Federal Bureau of Prisons, Cameron Lindsay, Warden of MDC Brooklyn, Respondents.

No. 09-CV-3522 (ARR).
Jan. 15, 2010.

JUDGMENT

**\*1** An Opinion and Order of Honorable Allyne R. Ross, United States District Judge, having been been filed on January 15, 2010, adopting the Report and Recommendation of Magistrate Judge Cheryl L. Pollak, dated November 9, 2009, after a *de novo* review of the record; and denying the petition for a writ of mandamus; it is

Douglas Strong, Fairton, NJ, pro se.

Seth D. Eichenholtz, United States Attorney's Office, Brooklyn, NY, for Defendants.


ORDERED and ADJUDGED that petitioner take nothing of the respondents; that the Report and Recommendation of Magistrate Judge Cheryl L. Pollak is adopted; and that the petition for a writ of mandamus is denied.

ROBERT C. HEINEMANN

Clerk of Court

*REPORT AND RECOMMENDATION*
CHERYL L. POLLAK, United States Magistrate Judge.

Petitioner Douglas A. Strong, proceeding *pro se,* brings this petition, seeking a writ of mandamus to vacate certain sanctions, specifically, the loss of good conduct time and his return to a secure facility, which were imposed by respondents after petitioner failed to comply with the terms of his work release program. Petitioner alleges that in imposing these sanctions, defendants violated his rights to due process by failing to give petitioner notice of the charges that were pending against him, by failing to provide him with a copy of the report that formed the basis for the charges, and by depriving petitioner of the right to attend the disciplinary hearing that resulted in the imposition of sanctions.

By Order dated October 20, 2009, the petition for mandamus was referred to the undersigned to issue a Report and Recommendation. For the reasons set forth below, it is respectfully recommended that petitioner Strong's petition for a writ of mandamus be denied.

*FACTUAL BACKGROUND*

On November 9, 2007, petitioner was sentenced to a term of 33 months imprisonment and 2 years of supervised release after his conviction for bringing illegal aliens into the country in violation of 8 U.S.C. § 1324(a)(2)(B). (Gvt. Mem.FN1 at 2). On April 14, 2009, he was transferred to a work release program at a Community Corrections Center ("CCC") in Brooklyn to serve out the remainder of his sentence. (*Id.;* Pet'nFN2 at 1). Petitioner alleges that he paid his subsistence fees and remained drug and alcohol free while in the program. (Pet'n at 1). The rules of the CCC (the "Rules") and the Community Based Program Agreement (the "Agreement"), which petitioner was required to sign, provide that: "[a]ny unauthorized absence from the facility will be considered an as escape." (Eichenholtz Dec.,FN3 Ex. A). The Agreement clearly provides that if an inmate fails to call the facility to report that he will be returning late from a pass, that would be considered an escape and a disciplinary report would be generated. (*Id.*)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN1. Citations to "Gvt Mem." refer to
Government's Memorandum of Law in Op-
position to Petition Seeking a Writ of Man-
damus, dated October 15, 2009.

FN2. Citations to "Pet'n" refer to the Peti-
tion for a Writ of Mandamus pursuant to
28 U.S.C. § 1361, filed on July 22, 2009.

FN3. Citations to "Eicenholtz Dec." refer
to the Ddclaration of Seth D. Eichenholtz,
Assistant United States Attorney, dated
October 14, 2009.

According to petitioner, on June 20, 2009, he
went to work and was granted a weekend pass to
visit his sister on Long Island. (Pet'n at 2). He
claims that on June 21, 2009, he made a call to the
half way house and was told that he was considered
an escapee. (Id.) Petitioner told the staff that he had
a weekend pass, but they indicated that because it
was the weekend, they were unable to access the re-
cords. (Id.) He was told to turn himself in at the
United States Marshal's office, which he did the
following morning. (Id.)

*2 Respondents' story is slightly different.
They contend that on June 20, 2009, at approxim-
ately 5:30 a.m., petitioner signed out of the CCC to
go to work at his job at Conceptual Restoration in
the Bronx. (Eichenholtz Dec., Ex. B). The work
pass allowed him to be out of the CCC between
5:00 a.m. and 6:00 p.m. (Id.) When petitioner failed
to return to the CCC by 6:00 p.m., the CCC contac-
ted both the local police and local hospitals but he
was nowhere to be found. (Id.) Effective as of 6:00
p.m., petitioner was declared on escape status. (Id.)

On June 22, 2009, petitioner was taken into
custody and housed at the MDC Brooklyn. (Colvin
Dec.FN4 ¶ 3; Garcia Dec.FN5 ¶ 7). According to
the government, petitioner was charged with
"Escape from Unescorted Community Programs
and Activities and Open Institutions (Minimum)
and from Outside Secure Institutions-without Viol-
ence, Code 200." (Garcia Dec. ¶ 6) (emphasis in

original). The government contends that a notice of
this Bureau of Prisons ("BOP") charge was served
on defendant on June 24, 2009, and he signed a
form stating that he received the notice on that day.
(Eichenholtz Dec., Ex. C).

FN4. Citations to "Colvin Dec." refer to
the Declaration of Crista M. Colvin, dated
Oct. 14, 2009.

FN5. Citations to "Garcia Dec." refer to
the Declaration of Daniel Garcia, dated
October 14, 2009.

According to the government, residents of the
CCC who violate the rules have a right to a Center
Discipline Committee ("CDC") hearing relating to
the violation. (Garcia Dec. ¶¶ 3-4). The initial hear-
ing was held on June 25, 2009. (Id. ¶ 9). However,
because BOP regulations require at least 24 hours
notice and petitioner only received the notice 21
hours prior to the hearing, a new hearing was set
for July 13, 2009. (Id. ¶ 10) According to the gov-
ernment, petitioner chose not to be represented by a
staff member at the hearing, chose not to present
any witnesses, and simply made a statement in
which he admitted that he had gone to a bar after
work, gotten into an altercation and chosen not to
return to the CCC in accordance with his curfew,
(Eihenholtz Dec., Ex. E). Based on the CDC's find-
ing that petitioner had committed the charges, a re-
commendation was made that petitioner be trans-
ferred to a more secure facility and that he lose
available good conduct time. (Id.) Daniel Garcia,
MDC Brooklyn's Disciplinary Hearing Officer, re-
viewed the CDC's recommendation to ensure that
the proper procedures had been followed. (Garcia
Dec. ¶¶ 8-10).

Petitioner disputes the government's claim that
he received a copy of the incident report, asserting
that as of the date of the Petition, "Strong still has
never received a copy of the report." (Pet'n at 4).
Petitioner contends that when he questioned his
Unit Manager as to why he did not receive a report
and was not afforded a hearing, the Unit Manager

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

responded: " 'Strong if you or anyone else violates the half way house rules your hearing is held in absentia and your [sic] returned to prison.' " (*Id.*) Accordingly, because petitioner contends that he was not afforded the procedural protections required in a prison disciplinary proceeding, he brings this mandamus petition seeking an order restoring his good time, his original release date of December 7, 2009, and restoring him to the work release program. (*Id.* at 6).

### *DISCUSSION*

A. *Requirements for Mandamus Relief*

**\*3** Under 28 U.S.C. § 1361, the district court has "original jurisdiction in any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." Before a writ of mandamus may issue, petitioner must demonstrate that there is: "(1) a clear right in the plaintiff to the relief sought; (2) a plainly defined and peremptory duty on the part of the defendant to do the act in question; and (3) no other adequate remedy available." *Anderson v. Bowen,* 881 F.2d 1, 55 (2d Cir.1989); *see also Aguiar v. Laird,* No. 07 CV 1081, 2008 WL 795303, \*2 (E.D.N.Y. Mar. 24, 2008) (defining the conditions that the plaintiff must demonstrate: 1) he must show that there is "no other adequate means to attain the relief he desires;" 2) he must demonstrate that his right to mandamus is "clear and indisputable:" and 3) the court must be satisfied that the writ is appropriate under the circumstances) (internal quotations omitted).

Mandamus "is an extraordinary remedy that is 'granted only in the exercise of sound discretion.' " *Miller v. French,* 530 U.S. 327, 340, 120 S.Ct. 2246, 147 L.Ed.2d 326 (2000) (citation omitted); *see also In re Dow Corning Corp.,* 261 F.3d 280, 285 (2d Cir.2001) (noting that the remedy of mandamus is "rarely granted"). Indeed, the common law writ of mandamus, as codified in 28 U.S.C. § 1361, only provides a remedy "if [the petitioner] has exhausted all other avenues of relief and only if the [respondent] owes him a clear nondiscretionary

duty." *Kerr v. United States Dist., Court,* 426 U.S. 394, 402-03, 96 S.Ct. 2119, 48 L.Ed.2d 725 (1976). To this end, a federal court's jurisdiction under the statute is "limited to actions seeking to compel the performance of a non-discretionary duty." *Duamutef v. INS,* 386 F.3d 172, 180 (2d Cir.2004); *see also Defeo v. Lapin,* No. 08 CV 7513, 2009 WL 1788056, \*2 (S.D.N.Y. June 22, 2009). Thus, a court must dismiss a petition for a writ of mandamus if the petition seeks to compel a discretionary action by a government agency. *Defeo v. Lapin,* 2009 WL 1788056, at \*2 (holding that the court lacked jurisdiction to issue a writ of mandamus where petitioner sought an order compelling the director of the BOP to file a motion for a reduction in petitioner's sentence on the grounds that such a decision was discretionary on the part of the BOP); *see also Wilbur v. United States ex rel. Kadrie,* 281 U.S. 206, 218, 50 S.Ct. 320, 74 L.Ed. 809 (1930) (holding that a writ of mandamus may not compel "the exercise of judgment or discretion in a particular way").

B. *Exhaustion of Administrative Remedies*

As an initial matter, the government contends that the petition should be dismissed because petitioner has failed to exhaust his administrative remedies.

Under the Prison Litigation Reform Act ("PLRA"), "no actions shall be brought with respect to prison conditions under section 1983 [of Title 42], or any other Federal law, by a prisoner confined in jail, prison, or any other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "Complete pre-suit exhaustion is required." *Barney v. Bureau of Prisons,* No. 02 CV 5284, 2004 WL 2810108, at \*6 (E.D.N.Y. Dec.8, 2004); *see also Williams v. United States,* No. 02 CV 6523, 2004 WL 906221, at \*5 (S.D.N.Y. Apr.28, 2004). Thus, before filing suit, an inmate must challenge the condition to the highest level of administrative review. *Id.* at \*1. The exhaustion requirement applies to "all inmate suits about prison life, whether they

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Id.* at 532; *see also Baez v. Bureau of Prisons,* No. 02 CV 9216, 2004 WL 1777583, at *4 (S.D.N.Y. May 11, 2004). The purpose behind the exhaustion requirement is to afford corrections officials time to address complaints internally. *See Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

**\*4** The government represents that the BOP has established a procedure which allows inmates to seek administrative review of any complaint regarding their incarceration. (*See* Gvt. Mem. at 5); *see also* 28 C.F.R. § 542.10; *Baez v. Bureau of Prisons,* 2004 WL 1777583, at *4 (discussing the BOP procedures when an inmate seeks to challenge any issue relating to an aspect of his confinement). The BOP Administrative Remedy Program requires that an inmate first attempt to resolve his dispute informally through the staff and the staff is required to try to resolve the issue. *See* 28 C.F.R. § 542.13(a); *see also Baez v. Bureau of Prisons,* 2004 WL 1777583, at *2. If that method is not successful, the inmate may, within 20 days of the event, seek the Warden's review by submitting a Form BP-9, which is a written "Administrative Remedy Request to the Warden." *See* C.F.R. § 542.15(a). If the inmate's BP-9 request is denied, the inmate may file a Form BP-10 appeal to the Regional Director of the BOP. 28 C.F.R. § 542.15(a). Disciplinary sanctions can be challenged initially through the filing of a BP-10 Form. 28 C.F.R. § 542.14(d)(2). If the Regional Director denies the appeal, that decision in turn may be appealed through a BP-11 appeal to the General Counsel's Office within 30 days of the Regional Director's decision. 28 C.F.R. § 542.15(a); *see Baez v. Bureau of Prisons,* 2004 WL 1777583 at *2. Until the BOP's Central Office considers the appeal, no administrative remedy is considered to be fully exhausted.

In opposing Mr. Strong's petition, the government acknowledges that petitioner filed a BP-10 on July 30, 2009, appealing the sanctions imposed as a result of his escape from the CCC. (Colvin Dec. ¶ 5). Before filing a BP-11, however, petitioner commenced this instant lawsuit. (*Id.* ¶ 6). Thus, petitioner has failed to completely exhaust his administrative remedies. *See Barney v. Bureau of Prisons,* 2004 WL 2810108, at *6. Moreover, even if petitioner has since taken steps to completely exhaust his administrative remedies under Section 1997e, this would nonetheless be insufficient because petitioner must have pursued all institutional remedies before filing suit; "it is not enough to take steps toward exhaustion or even to exhaust a claim, during the pendency of the case." *Baez v. Bureau of Prisons.* 2004 WL 1777583, at *5.

Accordingly, it is respectfully recommended that the petition be dismissed based on Mr. Strong's failure to exhaust all administrative remedies prior to filing this petition.

C) *Requirements for Mandamus Relief*

1) *Disciplinary Procedures are Discretionary*

The government contends that even if petitioner had exhausted his administrative remedies, a writ of mandamus is not warranted because the BOP has discretion to decide how to implement its disciplinary procedures and therefore, petitioner's " 'right to relief is [not] clear and indisputable.' " (Gvt. Mem. at 7-9 (quoting *In re FCC,* 217 F.3d 125, 134 (2d Cir.2000)). The government asserts that the procedures for disciplinary action are established by BOP regulation and require that an inmate be given notice of the charges and a hearing. *See* 28 C.F.R. § 541.17. The procedures also allow for an inmate to be present during the hearing. *Id.* However, the procedures are subject to modification in the exercise of BOP discretion when institutional concerns and individual circumstances require deviation. *Id.* Thus, when an inmate escapes, the hearing may be held in absentia with notice served on the inmate when he is taken back into custody. *Id.* § 541.17(d).

**\*5** To the extent that petitioner's claim is based on a perceived deviation from agency procedure,

Not Reported in F.Supp.2d, 2010 WL 276206 (E.D.N.Y.)
**(Cite as: 2010 WL 276206 (E.D.N.Y.))**

the BOP is afforded discretion to modify the procedures and therefore, no clearly defined peremptory duty exists for which a writ of mandamus may issue.

2) *No Due Process Violation*

Petitioner alleges that the government violated his right to procedural due process. (Pet'n at 4-7). To make out such a claim, petitioner must first prove the existence of a protected interest, and then prove government deprivation of that interest without due process of law. *See, e.g., Tellier v. Fields,* 208 F.3d 69, 79-90 (2d Cir.2000). The government argues that petitioner fails on both prongs of the test. (Gvt. Mem. at 9-13).

The Court agrees that petitioner's removal from his work release program did not implicate a liberty interest upon which petitioner may base his due process claim. As the court in *Tellier v. Scott,* No. 94 CV 3459, 2004 WL 224499, at * 1 (S.D.N.Y. Feb. 5, 2004), noted: "the violation of a BOP regulation itself does not constitute a violation of due process." Rather, the question for the court is whether a liberty interest has been created by statute or regulation such that a due process right exists.

Congress has given the BOP broad discretion to "designate the place of a prisoner's imprisonment." *18 U.S.C. § 3621(b).* It follows that no liberty interest exists that would apply to plaintiff's placement in a half way house or rehabilitation program. *See Castellar v. Federal Bureau of Prisons,* No. 07 CV 3952, 2009 WL 1674642, * 1 (E.D.N.Y. May 29, 2009); *see also Sealey v. Giltner,* 116 F.3d 47, 52 (2d Cir.1997) (noting that an inmate's confinement only implicates a protected interest if it constitutes a "deprivation [that] is atypical and significant and the state has created the liberty interest by statute or regulation"). Given that petitioner has no liberty interest or right to be placed in a work release program, he cannot claim a due process violation based on the BOP's decision to remove him from that program. *See Castellar v. Federal Bureau of Prisons,* 2009 WL 1674642, * 1.

Even if petitioner could establish a liberty interest that was implicated here, his due process claim still must fail because the procedures that were followed did comport with the requirements of due process. In *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Supreme Court indicated that in the context of disciplinary process for inmates, constitutional due process requires that the inmate receive notice of the charges against him and an opportunity to be heard. As long as a disciplinary sanction is based on some evidence, it satisfies the standard for due process, *See, e.g., Superintendent, Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 454-56, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

Here, the government argues that the BOP paperwork indicates that petitioner was taken into custody at the Brooklyn MDC on June 24, 2009, where petitioner was given prompt notice of the charges. (Gvt. Mem. at 12). Along with the notice, petitioner was given an incident report completed by one of the supervisors at petitioner's work release program detailing the evidence against him, including that petitioner failed to report back to the facility at 6:00 p.m. and had neither been arrested nor admitted to a hospital. (Eichenholtz Dec., Ex. B). The notice, which petitioner signed for, further states that there would be a hearing on June 25, 2009 at 12:46 p.m. (*Id.,* Ex. C). Moreover, there were two hearings held in this case: one on June 25, 2009, and a second hearing held July 13, 2009 because petitioner had received less than 24 hours notice of the first proceeding. (*Id.,* Ex. D). In the report prepared by the hearing committee, petitioner is reported to have explained at the hearing that he "went to a bar after work" and subsequently "decided not to return to the facility." (*Id.,* Ex. E) (quoting "Summary of Inmate Statements" section in report). These statements in the report are actually initialed by petitioner, demonstrating that he had an opportunity to be heard, and was given an opportunity to review his statements, before the committee rendered its decision.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 276206 (E.D.N.Y.)
**(Cite as: 2010 WL 276206 (E.D.N.Y.))**

**\*6** Accordingly, in light of the documents presented by the BOP, it appears that petitioner does not have a clear right to any of the relief that he seeks and therefore he cannot satisfy the requirements needed before a writ of mandamus may issue. *See Anderson v. Bowen,* 881 F.2d at 55.

### *CONCLUSION*

For the reasons stated above, this Court respectfully recommends that the petition for a writ of mandamus be denied.[FN6] Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989). The Clerk is directed to mail copies of this Report and Recommendation to the parties.

> FN6. By Motion dated August 28, 2009, petitioner seeks discovery relating to similar incidents involving other BOP inmates, including, *inter alia,* "[a]ll BOP forms BP-37 which is the form for an inmate to sign if he waives his right to be present for a hearing in front of the DHO;" "[a]ll incident reports written by the Brooklyn and Bronx half-way houses that resulted in the inmates['] return to custody ..."; and "[a]ll the DHO reports on the hearings conducted for inmates that were returned for rule violations from the half way house." Given the Court's recommendation that the petition be denied, the Court has not reviewed petitioner's motion for discovery and denies it as moot.

SO ORDERED.

E.D.N.Y.,2010.
Strong v. Lapin
Not Reported in F.Supp.2d, 2010 WL 276206 (E.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 1009946 (M.D.Pa.)
**(Cite as: 2010 WL 1009946 (M.D.Pa.))**



Only the Westlaw citation is currently available.

United States District Court,
M.D. Pennsylvania.
Megan HOOKEY, Plaintiff
v.
Morrosa LOMAS, et al., Defendants.

Civil No. 1:CV–08–02284.
March 11, 2010.

Megan Hookey, Muncy, PA, pro se.

Sarah C. Yerger, Office of Attorney General, Harrisburg, PA, Michael P. Daley, Supreme Court of Pennsylvania, AOPC, Philadelphia, PA, for Defendants.

### *MEMORANDUM*

SYLVIA H. RAMBO, District Judge.

**\*1** Plaintiff Megan Hookey ("Hookey") initiated this civil rights action on December 22, 2008 with a complaint filed pursuant to the provisions of 42 U.S.C. § 1983, (Doc. 1), as amended April 29, 2009 (Doc. 25), while confined at the State Correctional Institution in Muncy, Pennsylvania ("SCI–Muncy"). Hookey sets forth allegations against several employees of the Pennsylvania Department of Corrections ("DOC"), a Pennsylvania State Trooper, an employee of the Lighthouse Prison Ministries, and the Honorable John DiSalle. Hookey contends that all these Defendants violated her constitutional rights in the context of state court custody proceedings involving her child. She seeks compensatory and punitive damages, as well as declaratory relief.

Before the court are several motions filed by Hookey, requesting a transfer to another state institution. (Docs. 9, 17 & 34.) For the reasons that follow, the motions will be denied.

### I. *Background*

In the instant motions, Hookey contends she is entitled to a transfer to another state institution because SCI–Muncy officials have disregarded her safety concerns and refused to cooperate with her in her efforts to protect herself and her infant son. (Doc. 17.) Specifically, she claims that SCI–Muncy officials are discriminating and retaliating against her by issuing her frivolous and false misconducts; denying her access to legal materials and access to the courts; denying her recreation time; and harassing her. (Docs. 9, 17 & 34.) In considering these motions, the court will set forth the background of Hookey's paternity and custody case, as well as her efforts in requesting a transfer from DOC officials by filing grievances.

Hookey began her incarceration at SCI–Muncy on January 23, 2008. (Doc. 45–2, Ex. A, Troy Edwards Decl., ¶ 21.) At the time, she was pregnant. (Doc. 25 at 3.) Hookey claims that on February 2, 2008, she received mail from outside the institution threatening the safety of herself and her unborn child. (*Id.*) Hookey claims that she filed a grievance with respect to this mail, and was told to contact security. (*Id.*) She asserts that security did not respond to her resulting request. (*Id.*)

On March 12, 2008, Hookey gave birth to a son, Parker Hookey, while still incarcerated. (Doc. 45–2, Ex. A, ¶ 29.) The child was placed in the care of Susie Mack with Lighthouse Prison Ministry until Hookey's release from prison. (Doc. 25 at 3.) On April 8, 2008, an individual named Aaron Jones filed for custody of the child. (Doc. 25 at 3.) Hookey maintains that Jones is not the biological father of her child. (*Id.*) The Honorable John DiSalle of the Court of Common Pleas of Washington County, Pennsylvania, entered an order to have DNA testing performed on the child to confirm the paternity of Jones. (Doc. 45–3, Ex. A, ¶¶ 30–31.) However, Hookey refused this testing. (*Id.* ¶ 30.) As a result, Jones, through his attorney Joseph Zupancic, filed a petition for a rule to show cause why Jones should not be granted custody of the

Not Reported in F.Supp.2d, 2010 WL 1009946 (M.D.Pa.)
**(Cite as: 2010 WL 1009946 (M.D.Pa.))**

child. (Doc. 45–3, Ex. B, Rule to Show Cause, 2–9.) Judge DiSalle held a videoconference hearing on the petition on July 28, 2008, which was attended by Aaron Jones and his parents, Hookey, and Troy Edwards, SCIMuncy's Acting Corrections Superintendent's Assistant and Grievance Coordinator. (Doc. 45–2, Ex. A, ¶ 31.) Following the hearing, Judge DiSalle issued an order awarding sole custody of the child to Aaron Jones and allowed law enforcement to enforce the order. (Doc. 45–3, Order of Court, 11.)

**\*2** On July 28, 2008, with the court order and the assistance of Defendant Townshend, a Pennsylvania State Trooper, Jones acquired physical custody of the child from Susie Mack. (Doc. 25 at 4.) Hookey claims that since that date she has been filing complaints "to all defendants" about the safety of her child, including submitting photographs of him in neglectful care. (*Id.*)

On August 7, 2008, a paternity test revealed that Jones was the biological parent of the child within 99.9% accuracy. (Doc. 45–4, Ex. D, Paternity Test, 2.) On August 12, 2008, SCI–Muncy's Program Review Committee ("PRC") met with Hookey to discuss her concerns about her son's welfare. (Doc. 45–4, Ex. E., PRC Letter, 4–5.) PRC member Wendy Nicholas's follow-up letter to Hookey addressed Hookey's concerns over visitation with her child prior to Jones obtaining custody and granted Hookey a telephone call to Children and Youth Services ("CYS") to discuss her concerns with her son's placement and medical status. (*Id.*) Ms. Nicholas also informed Hookey that any further concerns about her son's placement should be directed to CYS by written correspondence. (*Id.*)

The Washington County Domestic Relations office scheduled a review hearing in Hookey's custody case in December 2008. Prior to the hearing, Hookey was informed by Defendant Counselor Rippey that SCI–Muncy did not have a court order for Hookey's attendance at the hearing. (Doc. 45–2, Ex. A, ¶ 33.) However, Defendant Harvey, a member of the Parenting Department, provided the ad-

ministrative assistant at the Washington County Domestic Relations office with her contact information should the office wish to request, subpoena, or order Hookey's participation. (*Id.* ¶ 34.) SCI–Muncy did not receive such a request. (*Id.* ¶ 35.) As a result of the review hearing, which took place in January 2009, Aaron Jones continues to maintain custody of the child. (Doc. 45–5, Ex. G, 4.)

Hookey filed several grievances at SCI–Muncy regarding her custody case. On June 28, 2008, Hookey filed an inmate request to staff member, requesting permission to file a request for protection from abuse ("PFA") in response to threats to herself and her child from someone outside the institution. (Doc. 45–2, Ex. A–1, 19.) In response, Intelligence Gathering Captain Robenolt provided Hookey with contact information for a Pennsylvania State Police trooper who could accept her PFA filing. (*Id.*) On July 2, 2008, Hookey filed grievance number 234431, complaining that she had not been permitted to file a PFA. (*Id.* at 18.) This grievance was denied because it had been resolved upon initial review by providing Hookey with state police information. (*Id.*) Hookey did not appeal this decision.

On July 8, 2008, Hookey filed an inmate request to staff member, inquiring about whether SCI–Muncy staff had received a grievance she filed on June 29, 2008 which alleged she had been assaulted. (Doc. 61 at 12.) Staff member Gordner responded on July 11, 2008, informing Hookey that staff had not received such a grievance. (*Id.*) Hookey did not appeal this decision.

**\*3** On October 14, 2008, Hookey filed an inmate request to staff, requesting the address of FBI Agent Patrick Howley in order to contact him about investigating the kidnaping of her son. (Doc. 45–2, Ex. A–1, 28.) Accordingly to Hookey, Aaron Jones had kidnaped her son and placed him in harm. (*Id.*) Captain Robenolt responded on October 24, 2008, providing Hookey with Agent Howley's address. (*Id.*) On October 21, 2008, Hookey filed another inmate request to staff member, requesting Captain

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Robenolt contact Agent Howley on her behalf. (*Id.* at 27.) Captain Robenolt responded on October 24, 2008, informing Hookey that her request was beyond the scope of his job function, but advised her to contact Agent Howley directly. (*Id.*) On November 19, 2008, Hookey filed grievance number 251935, asserting that Defendant Sisley refused her mail contact and a telephone call to Agent Howley for the investigation of the kidnaping of her son. (*Id.* at 25.) Captain Robenolt denied this grievance on December 5, 2008, but advised Hookey to write directly to Agent Howley regarding her request for investigation. (*Id.* at 24.) On December 8, 2008, Hookey appealed that denial to the Superintendent. (*Id.* at 22–23.) The Superintendent denied Hookey's appeal on December 10, 2008, finding that the grievance had been properly addressed and that Hookey had not provided any corroborating evidence to support her claims. (*Id.* at 21.) Hookey did not appeal this decision.

On December 9, 2008, Hookey filed grievance number 253793, alleging that she had received an unfair psychological diagnosis from Ms. Lois Brown–Velkoff, a counselor she had never met or seen. (Doc. 45–2, Ex. A–3, 35.) She further claimed that this diagnosis was then revealed to sources outside SCI–Muncy without her consent or a court order. (*Id.*) SCI–Muncy's Licensed Psychological Manager Lisa D'Addio denied the grievance on December 23, 2008, informing Hookey that SCIMuncy medical, psychological, and psychiatric staff all have proper access to Hookey's file. (*Id.* at 34.) On December 29, 2008, Hookey appealed that denial to the Superintendent. (*Id.* at 32–33.) The Superintendent denied Hookey's appeal on January 12, 2009, affirming Manager D'Addio's decision. (*Id.* at 31.) Hookey did not appeal this decision.

On January 1, 2009, Hookey filed grievance number 256602, seeking access to her legal materials and reimbursement of her legal fees. (Doc. 45–2, Ex. A–4, 40.) Grievance Officer Gridley responded on January 14, 2009, informing Hookey that she had received her allowable property and

legal mail. (*Id.* at 39.) He also denied her request for reimbursement of her legal fees and advised her to write a request slip for access to the law library, if necessary. (*Id.*) On January 18, 2009, Hookey appealed that denial to the Superintendent. (*Id.* at 38.) The Superintendent denied Hookey's appeal on January 27, 2009, citing Hookey's own previous statements regarding the receipt of her legal materials and mail to counter her allegations. (*Id.* at 37.) Hookey did not appeal this decision.

**\*4** On January 1, 2009, Hookey filed grievance number 256629, setting forth her concerns over SCI–Muncy staff's refusal of her participation in the custody review hearing. (Doc. 45–2, Ex. A–5, 47.) She also claimed that "SCI Muncy has made every attempt to keep me from reporting the deplorable conditions of my infant son." (*Id.*) The grievance was denied by Ms. Nicholas on January 16, 2009. (*Id.* at 46.) In that denial, Ms. Nicholas stated:

> After reviewing your grievance and the available documentation, as well as speaking with Mr. Deibler–Gorman, the answer to this grievance remains the same as my response to your request slip dated 1/08/09. While I understand your frustration with the current situation with your son, at the time of his placement, you were given a phone call by Ms. Hummel to Childline [CYS] with which to address your concerns. Since that time, you allege that he is residing in deplorable living conditions but you have no verification of this. During our discussions, you were basing this belief on two pictures your received where your son was standing by a table on the porch and you did not see any adult close in proximity. This is not verification of deplorable living conditions or neglect. If you have something legitimate that would support your statements, please provide it to Ms. Harvey for review so that an informed decision can be made about the need for a referral to Child and Youth Services. As staff, we do not make these allegations against caregivers without supporting evidence.

Not Reported in F.Supp.2d, 2010 WL 1009946 (M.D.Pa.)
**(Cite as: 2010 WL 1009946 (M.D.Pa.))**

(*Id.*) On January 21, 2009, Hookey appealed that denial to the Superintendent. (*Id.* at 44–45.) The Superintendent denied the appeal on February 4, 2009, affirming Ms. Nicholas' decision. (*Id* . at 43.) Hookey did not appeal this decision.

On January 10, 2009, Hookey filed grievance number 257219, alleging that Defendant Counselor Rippey had not properly completed Hookey's annual review, was not addressing her concerns, and had filed fabricated misconducts against her. (Doc. 45–2, Ex. A–6, 52–53.) Unit Manager William Frantz responded on January 16, 2009, finding Hookey's claims frivolous. (*Id.* at 51.) On January 21, 2009, Hookey appealed that denial to the Superintendent, accusing Defendant Counselor Rippey of retaliating against her for filing grievances and requesting a new counselor. (*Id.* at 50.) The Superintendent denied the appeal on January 27, 2009, finding that Hookey had provided no evidence to support her allegations. (*Id.* at 49.) The Superintendent also reminded Hookey that as of January 25, 2009, she had been assigned a new counselor. (*Id.*) Hookey did not appeal this decision.

On January 12, 2009, Hookey filed grievance number 257505, alleging that Lieutenant Gridley was retaliating against her and threatening to place her in the infirmary for filing a grievance against Restricted Housing Unit ("RHU") officers, who had denied her sanitary pads. (Doc. 45–2, Ex. A–7, 58–59.) Lieutenant Bennett responded on January 21, 2009, informing Hookey that Lieutenant Gridley recommended placement in the infirmary in order to address her health concerns. (*Id.* at 57.) He also informed her that on the day in question she had already been given the allotted amount of sanitary pads, but recommended that she sign up for sick call to address her medical concerns. (*Id.*) On January 26, 2009, Hookey appealed that denial to the Superintendent, claiming Lieutenants Bennett and Gridley were lying. (*Id.* at 56.) The Superintendent denied the appeal on February 9, 2009, finding that Hookey had provided no evidence to support her allegations. (*Id.* at 55.) Hookey did not appeal this

decision.

**\*5** On January 20, 2009, Hookey filed grievance number 258353, alleging that the law librarian had not sent back time-sensitive legal copies in a timely fashion, causing her court cases to be dismissed. (Doc. 45–2, Ex. A–8, 62.) Corrections School Principal Richard Shuler responded, informing Hookey that she had submitted her request for copies on January 12, 2009, and therefore the law librarian would have received the request on January 13, 2009 or later. (*Id.* at 61.) Further, the librarian did not work on January 16 through 19, 2009, but fulfilled the request upon her return on January 20, 2009, and returned the copies on January 21, 2009. (*Id.*) Therefore, he concluded, the copies were properly mailed within five working days. (*Id.*) Hookey did not appeal this decision.

On March 3, 2009, Hookey filed an inmate request to staff member, requesting a transfer. (Doc. 61 at 9.)) SCI–Muncy staff member E.C. denied Hookey's request on March 3, 2009. (*Id.*) Hookey did not appeal this decision.

On June 14, 2009, Hookey filed grievance number 277143, alleging that she did not receive proper medical treatment for her ailments caused by the stress of her legal cases. (Doc. 45–2, Ex. A–9, 67.) Corrections Health Care Administrator Gloria Diggan responded on June 25, 2009, finding that the RHU officers reported Hookey's complaints to the medical unit and a nurse had assessed her for her complaint of high blood pressure, but found the levels to be within normal range. (*Id.* at 66.) Hookey did not appeal this decision.

Finally, Defendants assert that during a group session with an SCI–Muncy treatment specialist, Hookey reported that her son was deceased. (Doc. 45–2, Ex. A, ¶ 38.) After a brief investigation, prison officials confronted Hookey with this statement. (*Id.*) A phone call was placed to Hookey's mother to ensure the health and welfare of her son. (*Id.*)

**II.** *Discussion*

The Pennsylvania DOC has an Inmate Grievance System which permits any inmate to seek review of problems that may arise during the course of confinement. 37 Pa.Code § 93.9(a); *see also* www.cor.state.pa.us, DOC Policies, Policy No. DC–ADM 804, Inmate Grievance System. After an attempt to resolve any problems informally, an inmate may submit a written grievance to the facility's Grievance Coordinator for initial review. An inmate may then appeal an adverse decision of the Grievance Coordinator to the Superintendent of the institution, and can finally appeal to the Secretary of the DOC Office of Inmate Grievances and Appeals. *See Booth v. Churner,* 206 F.3d 289, 293 n. 2 (3d Cir.2000) (outlining Pennsylvania's grievance review process).

Generally, when an inmate wants to transfer to another institution, the procedure is initiated by the inmate requesting such a transfer through a staff member and providing the reasons for the request. (Doc. 45–2, Ex. A, ¶ 9.) In deciding whether to grant a request for a transfer, prison staff consider the reason for the request, the availability at other institutions for housing and applicable programs, the disciplinary status and history of the inmate, and the value of incentive for the inmate. (*Id.* ¶ 10.)

**\*6** Further, as set forth by Defendants, in addition to making a request with prison staff such as corrections officers, counselors, therapy leaders, medical staff and security staff, every day after inmate lunchtime, a procedure called "mainline" takes place in which inmates line up in order to speak to facility officials in the institution such as the Superintendent, Deputy Superintendents, Major, Superintendent's Assistant, and Intelligence Gathering/Security Captain. (*Id.* ¶ 27.) Inmates are also afforded the opportunity to address safety concerns through an anonymous telephone call, as each housing unit has a posted telephone number which inmates can use to call the Security Captain to report safety issues or fears. (*Id.* ¶ 28.)

In the instant case, Defendants assert that Hookey did not request a transfer informally

through a staff member or formally through SCI–Muncy's grievance system. (*Id.* ¶ 11; Doc. 45 at 2–3; Doc. 45–2, Ex. A–1, 16–79.) Further, Hookey did not discuss her fears for her safety in the institution with any staff member at SCIMuncy. (Doc. 45–2, Ex. A, ¶ 26.) Hookey also did not discuss her fears for her safety with any of the facility's officials. (*Id.* ¶ 27.) In addition, neither the Intelligence Gathering or the Security Captain received any anonymous telephone calls relating to Hookey's safety fears. (*Id.* ¶ 28.) As a result, at no point were SCI–Muncy officials put on notice of Hookey's desire to be transferred to another institution. However, in her reply brief to the instant motions,[FN1] Hookey attaches her July 8, 2008 request to staff member in which she did in fact request a transfer. (Doc. 61 at 9.) But this request was denied, and it appears that Hookey did not seek further review of her request.

FN1. This reply brief also addresses Defendants' motion to dismiss. (Doc. 61.)

It is well-settled that a prisoner has no justifiable expectation that she will be incarcerated in a particular prison or facility. *Olim v. Wakinekona,* 461 U.S. 238, 245, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983). Pennsylvania law leaves the housing of inmates in particular institutions to the discretion of state officials. *See* 37 Pa.Code § 93.11(a); *Hannon v. Terra,* Civ. A. No. 94–2845, 1995 WL 129219, at \*11 (E.D.Pa. Mar.24, 1995). Where the state does not provide a liberty interest in being housed at a particular institution, prison officials have the discretion to transfer an inmate "for whatever reason or for no reason at all." *Meachum v. Fano,* 427 U.S. 215, 228, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). "If the prisoner can be lawfully held in the facility to which [s]he has been transferred, [s]he cannot object to that transfer, even if the transfer results in [her] being placed in a more restrictive or less accessible facility." *Ali v. Gibson,* 631 F.2d 1126, 1135 (3d Cir.1980). "[T]ransfer to less amenable quarters for nonpunitive reasons [is] 'ordinarily contemplated by a prison sentence.' " *Sandin v.*

Not Reported in F.Supp.2d, 2010 WL 1009946 (M.D.Pa.)
**(Cite as: 2010 WL 1009946 (M.D.Pa.))**

*Conner,* 515 U.S. 472, 480, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (quoting *Hewitt v. Helms,* 459 U.S. 460, 468, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)). Moreover, interference in the placement determinations of the Pennsylvania Department of Corrections would involve the judiciary in "the day-to-day functioning of ... prisons ... [and] issues and discretionary decisions that are not the business of federal judges." *Meachum,* 427 U.S. at 228–29.

**\*7** Turning to the instant case, based on well-settled case law and without further consideration by SCI–Muncy officials of Hookey's desire to be transferred to another institution, this court will not interfere in the placement determination—a discretionary decision to be made by DOC officials—of Hookey. Thus, her motions for a transfer will be denied. An appropriate order follows.

### *ORDER*

In accordance with the attached memorandum of law, **IT IS HEREBY ORDERED THAT** the motions for a transfer (Docs. 9, 17 & 34) are **DENIED.**

M.D.Pa.,2010.
Hookey v. Lomas
Not Reported in F.Supp.2d, 2010 WL 1009946 (M.D.Pa.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2010 WL 3468124 (S.D.N.Y.)
**(Cite as: 2010 WL 3468124 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
S.D. New York.
Neil JOHNSON, Hiawat[h]a Burks, Ronald Counts,
Ju[d]e Fernand, Kasey Harge, Devon Pandy, Carl
Stevens, Robert Taylor, Kevin Washington, and the
Sunni Muslim Community at FCI Otisville,
Plaintiffs,
v.
Warden J. KILLIAN, Rabbi Laskin, and Case Man-
ager D. Wynkoop, in their individual and official
capacities, Defendants.

No. 07 Civ. 6641(NRB).
Aug. 23, 2010.

Neil Johnson, FCI Elkton, Lisbon, OH, for
Plaintiff.

Li Yu, Esq., Office of the U.S. Attorney, Civil Di-
vision, New York, NY, for Defendant.

**MEMORANDUM AND ORDER**

NAOMI REICE BUCHWALD, District Judge.

*1 Before the Court is a motion for summary
judgment brought by Dawn Wynkoop against Neil
Johnson, concerning Johnson's claim under *Bivens
v. Six Unknown Named Agents of the Federal Bur-
eau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29
L.Ed.2d 619 (1971), that Wynkoop retaliated
against him in violation of his First Amendment
rights under the United States Constitution. For the
following reasons, Wynkoop's motion is granted.

**BACKGROUND**[FN1]

FN1. The background in this section is
drawn from the parties' submissions. Un-
less otherwise noted, the facts are undis-

puted. In Section II.C. of the Discussion,
*infra,* we address additional issues of fact
raised by Johnson and explain why they
are not genuine issues of material fact that
prevent the entry of summary judgment in
Wynkoop's favor.

**I. Procedural History**

This litigation commenced before Judge Swain
on July 24, 2007, when Johnson, then an inmate at
FCI–Otisville in New York, filed a complaint as-
serting claims under the First Amendment and the
Religious Freedom Restoration Act challenging
prison guidelines limiting congregate prayers. In
August 2007, Johnson was transferred to
FCI–Elkton in Ohio.

On January 31, 2008, Johnson and eight other
individually-named plaintiffs filed an amended
complaint purporting to assert claims relating to the
prayer policy on each individual's behalf and on be-
half of a class of Muslim inmates at FCI–Otisville.
As part of the amended complaint, Johnson also as-
serted a retaliation claim against
Wynkoop—alleging, as we explain further below,
that she engineered his transfer to FCI–Elkton in re-
sponse to his lawsuit. (*See* Amended Complaint
("Am.Compl.") at 7.)

On April 21, 2009, Judge Swain issued a
Memorandum and Order dismissing all of the
claims in the amended complaint except for the re-
taliation claim asserted by Johnson against
Wynkoop. *See Johnson v. Wynkoop,* No. 07 Civ.
6641(LTS), 2009 WL 1066248 (S.D.N.Y. Apr.21,
2009).

The case was referred to the docket of the un-
dersigned on June 5, 2009. On June 22, 2009, we
denied a motion by Johnson for reconsideration of
Judge Swain's decision. Accordingly, the claim that
is the subject of this opinion is the only remaining
claim in this case.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3468124 (S.D.N.Y.)
**(Cite as: 2010 WL 3468124 (S.D.N.Y.))**

Following a lengthy period of discovery, which included multiple extensions at Johnson's request, Wynkoop moved for summary judgment on April 20, 2010.

## II. The Inmate Security Classification and Transfer System of the Federal Bureau of Prisons ("the BOP")

In order to properly frame and address Johnson's allegations against Wynkoop, it is first necessary to provide some background on the BOP's system for inmate security classification and for inmate transfers between the BOP's various correctional facilities.

### A. The Security Classification System for Correctional Facilities and Inmates in the BOP's Custody

At all relevant times, the BOP has had five security classification levels for its correctional facilities and its inmate population: (1) minimum, (2) low, (3) medium, (4) high, and (5) administrative. (Def. Mem., Aycock Decl. ¶ 7.) A facility's security classification is based on its security and staffing resources. (*Id.* ¶ 8.) Throughout the time period at issue in this suit, FCI–Otisville was designated as a medium-security facility, and FCI–Elkton was designated as a low-security facility. (*Id.* ¶¶ 4, 5.)

*2 An inmate's security classification is based on the security risk posed by the individual and the supervision that the individual requires. (*Id.* ¶ 8.) When an inmate begins his term of incarceration, the BOP's Designation and Sentence Computation Center ("DSCC") makes an initial determination of his security level based on various "scoring items," including his criminal history and the severity of his offense. (*Id.* ¶¶ 9, 10.) The DSCC determines the inmate's initial security level based on the inmate's total score, known as the "security point total." (*Id.* ¶ 10 .)

An inmate's security level is updated annually by program staff at his place of incarceration in the "SENTRY" database, as part of the inmate's annual custody classification review. (*Id.* ¶ 11.) The up-

dated security levels are based on a similar scoring system that also incorporates the inmate's adjustment to incarceration, such as the frequency and severity of any disciplinary incidents. (*Id.* ¶¶ 13, 14.) An inmate's security level may be modified based on either a change in his personal circumstances or revisions to the BOP's inmate security classification policy. (*Id.*)

### B. The September 2006 Revisions to the BOP's Security Designation and Custody Classification Policy

In 2006, the BOP revised its Security Designation and Custody Classification Policy. (*Id.* ¶ 14.) The revisions took effect on September 12, 2006. (*Id.*)

Two revisions are pertinent here. First, two new scoring items—age and educational level—were added. (*Id.*) Second, the score ranges associated with each security level were raised. (*Id* .)

With respect to age, the older an inmate is, the lower he scores. For instance, an inmate over the age of 55, like Johnson, receives 0 points, while a 23–year–old inmate receives 8 points. (*Id.* ¶ 15.) With respect to education, an inmate with a high school education receives 0 points, while someone working toward a GED is given 2 points. (*Id.* ¶ 15.)

To account for the two new scoring items, the revised policy also raised the "security total" score ranges associated with the various security levels. (*Id.* ¶ 16.) For example, the "low security" score range was increased from 6–8 points to 12–15 points. (*Id.*)

One result of these revisions was that older inmates with a high school education were given security level reductions at their next annual custody classification reviews. (*Id.* ¶ 17.) This occurred because their "security total" held constant while the score ranges corresponding to all of the security levels were increased.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3468124 (S.D.N.Y.)
**(Cite as: 2010 WL 3468124 (S.D.N.Y.))**

## C. The BOP's Policy on Inmate Transfers

Pursuant to BOP policy, inmates are to be assigned to correctional facilities that correspond to their security classification levels. (*Id.* ¶ 18.) When there is a mismatch, staff at the correctional facility "must" refer the inmate to the DSCC for either transfer or the application of a "management variable." BOP Policy Statement 5100.08 at JOHN-SON–BOP 144. Inmate transfer requests must be approved by the DSCC. (Def. Mem., Mason Decl. ¶ 9.) It is the staff at the DSCC-not the staff at correctional facilities—who decides where inmates should be transferred. (*Id.* ¶ 10.)

**\*3** A "management variable" is the only basis for the DSCC to assign an inmate to a correctional facility with a security level that differs from the inmate's security level. *See* BOP Policy Statement 5100.08 at JOHNSON–BOP 108. Requests for management variables must be made by institution staff to the DSCC, and they are reviewed and approved by the DSCC. *Id.* In 2007, there were eleven grounds for applying management variables (e.g., if a sentencing court recommended a specific institution). *Id.* at JOHNSON–BOP 110–12. Critically, for the purposes of this case, the list did *not* include either an inmate's desire to remain close to family or, more generally, family circumstances. *See id.*

## III. The Allegedly Retaliatory Transfer

## A. Johnson's History of Incarceration in BOP Facilities

Johnson has been in the BOP's custody since 1993, when he began serving a 320–month term of imprisonment for conspiring to distribute over 100 grams of heroin. (Johnson Dep. at 13–14.) He began serving his sentence at FCI–Leaventhworth, a high-security facility located in Kansas. In 2000, following a reduction in Johnson's security level, he was transferred to FCI–Cumberland, a medium-security facility in Maryland. In or about September 2000, he was transferred from FCI–Cumberland to FCI–Otisville, another medium-security facility, in order to balance inmate population. (*Id.* at 22–24.)

## B. Wynkoop's Responsibilities at FCI–Otisville

During the period at issue in this lawsuit, Wynkoop was the assigned case manager in Johnson's unit ("Unit FB") at FCI–Otisville. (Def. Mem., Wynkoop Decl. ¶ 6.) One of her responsibilities was scheduling and conducting team meetings and program review meetings with inmates in the unit. (*Id.* ¶ 7.) She was also charged with maintaining the inmates' information in the SENTRY database and carrying out the annual custody classification updates. (*Id.* ¶ 9.) In addition, when Al Welch, the unit manager, was unavailable, she had authority to execute program documents, such as inmate transfer requests. (*Id.* ¶ 10.)

## C. Notice to Wynkoop of Johnson's Intent to File a Lawsuit

Johnson claims that on April 12, 2007, he and several other

Muslim inmates were prevented from engaging in congregational prayer. (Am. Compl. at 4.) Later that day, according to Johnson, Wynkoop called him into her office and told him that he would be disciplined if he attempted congregational prayer again. (*Id.*) According to Johnson, he then apprised Wynkoop of his intent to file a lawsuit concerning the prayer restrictions at the facility. (*Id* .)

## D. Johnson's Transfer From FCI–Otisville to FCI–Elkton

On April 20, 2007, Wynkoop issued a memorandum to a group of 38 inmates in the unit, advising them that their program review meetings had been scheduled for the following month. (Def. Mem., Wynkoop Decl. ¶ 11.) The plaintiff's meeting was scheduled for the afternoon of May 17, 2007. (*Id.*)

**\*4** In advance of the meeting, on May 15, 2007, Wynkoop conducted a routine update to Johnson's security and custody classification in the SENTRY database. (*Id.* ¶ 13.) Due to the 2006 revisions to the Security Designation and Custody Classification Policy, SENTRY indicated that Johnson's security level had dropped from medium to low. (

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Id.* ¶¶ 14, 15 and Ex. 3.) This was because Johnson was 57 years old and had a high school education. Accordingly, the recent addition of the "age" and "educational level" scoring items had not raised his security point total, but the score range required for an inmate to be held at a medium-security facility had increased. (*Id.* ¶ 15.)

On May 17, 2007, Johnson's program review meeting was unable to go forward due to an institution-wide lockdown at the facility resulting from a stabbing in another unit. (*Id.* ¶ 16.)

The parties dispute whose responsibility it was to reschedule the meeting. Wynkoop claims that she "expected Mr. Johnson to contact me on the following day to reschedule the meeting, but he did not do so." (*Id.*) Similarly, Welch maintains that as a general matter, "if an inmate missed a team meeting or a program review meeting with me or Ms. Wynkoop, it was incumbent on the inmate to reschedule the review meeting with one of us." (Def. Mem., Welch Decl. ¶ 8.) He adds that "[i]f an inmate missed a meeting and failed to reschedule it, the program staff responsible for the meeting would mark the inmate as having been absent." (*Id.*) For his part, Johnson claims that he was told by Wynkoop—in the midst of the lockdown—that "his team meeting would be rescheduled" and that this rescheduling would be done by Wynkoop. (Pl. Opp. at 5, 6 (citing Johnson Dep. at 74).)[FN2]

> [FN2.] Johnson also points to a BOP Policy Statement which, he claims, indicates that program review meetings that are cancelled must be rescheduled by corrections officers. (Pl. Opp. at 5 (quoting BOP Policy Statement 5322.12 ¶ 8(c)).) The provision says nothing of the sort. In fact, it merely states that, in the ordinary course, a team docket must be prepared and posted 48 hours in advance of a program review meeting. *See* BOP Policy Statement 5322.12 ¶ 8(c).

Johnson further claims that he approached Wynkoop several weeks later and asked why his meeting had not been rescheduled. (Pl. Opp. at 6.) He contends that Wynkoop told him that the meeting had in fact been rescheduled for May 18, 2007, but Johnson asserts that he had never been given notice of the meeting or otherwise placed on a "call-out sheet" to attend. (*Id.*)

In early June 2007, Wynkoop prepared an inmate transfer request for Johnson based on his new security designation. (Def. Mem., Wynkoop Decl. ¶ 19.) She prepared the request and signed it on behalf of Welch, who was unavailable. (Def. Mem., Welch Decl. ¶ 8 .)

In her declaration, Wynkoop states that "[a]s of May or June 2007, there was no record in Mr. Johnson's inmate files stating any special preference for where he would like to be incarcerated; and I was not otherwise aware of such a preference." (*Id.* ¶ 20.) Johnson does not dispute this narrow contention but claims that in 2006, he had told Wynkoop informally that if he were ever transferred, he wanted to be moved to a facility near his "ailing parents," such as Fort Dix. (Pl. Opp. at 5; *see also* Johnson Dep. at 61, 93.)

In the transfer request form, Wynkoop indicated that Johnson should be transferred to "[a]ny appropriate low-security facility." (Def. Mem., Aycock Decl. Ex. 1.) After the Warden of FCI–Otisville endorsed the request, Wynkoop submitted it to the DSCC on June 12, 2007 for approval. (*Id.* ¶ 22.)

**\*5** On June 13, 2007, the transfer request was approved by Steve Aycock, a senior designator at the DSCC. (Def. Mem., Aycock Decl. ¶ 5.) He reviewed the information in the request, verified it against the SENTRY database, and designated FCI–Elkton as the receiving facility for Johnson. (*Id.*) Wynkoop was not involved in the selection of FCI–Elkton. (Def. Mem., Wynkoop Decl. ¶ 23; Mason Decl. ¶ 10.)

On August 15, 2007, Johnson was transported

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

out of FCI–Otisville. He arrived at FCI–Elkton on or about August 27, 2007, where he has remained since. (Def. Mem., Mason Decl. ¶¶ 6, 7.)

**IV. Johnson's Allegations in this Proceeding Concerning the Allegedly Retaliatory Transfer**

In his amended complaint, Johnson alleged that Wynkoop violated his First Amendment rights "when she transferred him in retaliation for seeking to redress his grievances" and "in an attempt to moot" his lawsuit. (Am. Compl. at 7.)

Johnson took the same position in his deposition-that Wynkoop had personally engineered his transfer to FCI–Elkton through a mechanism that he could not specify. (*See* Johnson Dep. at 64–67.) When asked to describe the retaliatory action with specificity, Johnson testified that "[s]he transferred me eight hours away" from FCI–Otisville to Ohio, where his family would be unable to reach him. (*Id.* at 64.) He conceded that he had "no knowledge" as to "how she perfected the transfer" and "no idea" about the institution or office that specifically designated him to FCI–Elkton. (*Id.* at 67–68.) He also maintained that Wynkoop had prevented him from obtaining a management variable based on his family circumstances. (*Id.* at 82–85.)

As part of Wynkoop's motion for summary judgment, the Government adduced numerous BOP policy statements and declarations from BOP officials, which, as summarized above, describe how inter-facility transfers are executed. *See supra* Section II. Apparently in response to this information, Johnson's opposition papers presented a new theory in support of his claim. Contrary to his amended complaint and the testimony in his deposition, Johnson asserted that he was "not challenging the fact that he was transferred or the location to which the DSCC, [*sic* ] transferred him." (Pl. Opp. at 2.) Rather, he argued, this "case is based soley [*sic* ] on the fact that the Defendant circumvented and violated BOP policy to the best of her ability to thwart [his] ability to be transferred closer to his ailing parents and his family, by keeping him from placing his transfer location preferences into the re-

cord." (*Id.* at 3.)

***DISCUSSION***
**I. Applicable Legal Standards**

**A. Summary Judgment**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Factual disputes must be both "genuine" and "material." The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Quarles v. Gen. Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248.

**\*6** On a motion for summary judgment, the initial burden rests with the moving party to make a prima facie showing that no material fact issues exist for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once this showing is made, "[t]o defeat summary judgment, the non-movant must produce specific facts" to rebut the movant's showing and to establish that there are material issues of fact requiring a trial. *See Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998) (citing *Celotex,* 477 U.S. at 322). In determining whether a genuine issue of material fact exists, a court must view the facts in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. *See Lucente v. Int'l Business Machines Corp.,* 310 F.3d 243, 253 (2d Cir.2002).

Because Johnson is proceeding *pro se,* we read

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

his pleadings "liberally and interpret them to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (citation and internal quotation marks omitted); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). However, this does not relieve the plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment. *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 50 (2d Cir.2003).

## B. First Amendment Retaliation

To prevail on a First Amendment retaliation claim, a prisoner must prove three elements: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action. *Gill,* 389 F.3d at 380. There can be no dispute that the conduct at issue—Johnson's pursuit of a lawsuit—was constitutionally protected. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996); *Stokes v. Goord,* 9:03–CV–1402 (LEK)(DHR), 2007 WL 995624, at *5 (N.D.N.Y. Mar. 30 2007).

With respect to the second element, the Circuit defines "adverse action" objectively—as retaliatory conduct that would deter "a similarly situated individual of ordinary firmness" from exercising his constitutional rights. *Gill,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353, *superseded by* 320 F.3d 346, 2003 WL 360053 (2d Cir. Feb.10, 2003)). If the retaliatory action at issue does not satisfy this standard, it is "simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001). While courts have broadly defined actionable retaliation in a prison setting, not every response to a prisoner's exercise of a constitutional right is actionable. *See id.* at 492.

As to the third element, courts in this Circuit employ a burden-shifting framework: the plaintiff has the initial burden of proving that a discriminatory motive played a substantial part in the allegedly retaliatory action, and the burden then shifts to the

defendant to show that the action would have been taken even in the absence of the improper motive. *See Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994) (citing *Mt. Health City Sch. Dist. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

**\*7** The availability of First Amendment retaliation claims in the prison context is premised on the notion that corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill v. Pidlypchak,* 389 F.3d 379, 381–83 (2d Cir.2004). However, because of the relative ease with which claims of retaliation can be manufactured, *see Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983), the Second Circuit has advised district courts to "approach prisoner claims of retaliation with skepticism and particular care," *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001). As the Circuit has explained:

> This is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act. Given that such adversity is an ever-present concomitant of prison life, the opportunities to characterize its manifestations as actionable retaliation are far greater than that for society at large.

*Id.* (internal citations omitted). With this guidance in mind, we turn to the merits of Johnson's claim.

## II. Analysis of Retaliation Claim

In reviewing Johnson's claim, we begin by addressing the arguments made in Wynkoop's motion

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

and their relevance following Johnson's reconfiguration of his claim. We then explain why Johnson did not suffer a legally actionable "adverse action," even assuming the resolution of all disputed issues of material fact in his favor. Finally, we explain why additional questions of fact that Johnson raises are not genuine issues of material fact that prevent summary judgment in favor of Wynkoop.

### A. The Government's Position

Relying on Johnson's amended complaint and deposition, Wynkoop's opening brief made two independent arguments in support of summary judgment: (1) that Wynkoop was not personally involved in designating FCI–Elkton as Johnson's receiving facility, *see, e.g., Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987) (personal involvement in constitutional deprivation is a prerequisite to *Bivens* recovery); and (2) that the BOP had a legitimate, non-retaliatory basis for transferring Johnson to FCT–Elkton, due to the change in his security level.

The Government's arguments are no longer applicable given the manner in which Johnson reconstructed his claim in his opposition papers. At this point, Johnson does not "challenge the fact that he was transferred or the location to which the DSCC, [*sic* ] transferred him." (Pl. Opp. at 2.) Rather, as he puts it, his "case is based soley [*sic* ] on the fact that the Defendant circumvented and violated BOP policy to the best of her ability to thwart [his] ability to be transferred closer to his ailing parents and his family, by keeping him from placing his transfer location preferences into the record." (*Id.* at 3.) If this were true, and if this were a legally actionable "adverse action," we can assume (1) that this would satisfy the personal involvement requirement of a *Bivens* claim and (2) that on the record before us, there would be a genuine issue of fact concerning the basis for Wynkoop's actions.[FN3]

> FN3. Although we will address Johnson's claim as presented in his opposition papers, we nevertheless note the convenient timing of the shift, which appears to have taken place in response to the mostly un-

disputed facts and BOP policies presented in Wynkoop's motion. This adjustment presumably took place so that Johnson's lawsuit could withstand an otherwise strong motion.

### B. Johnson's Failure to Demonstrate an "Adverse Action"

**\*8** We nevertheless find that summary judgment should be granted to Wynkoop because the undisputed facts and relevant law compel us to conclude that there was not an "adverse action" for the purposes of a First Amendment retaliation claim. To make this determination, it is necessary to carefully define the retaliatory action at issue here—drawing on the plaintiff's presentation of his claim, the relevant BOP policies and practices, and the undisputed facts.

To start, we note once again that Johnson has specifically disclaimed the argument that his transfer should not have occurred or that he necessarily should have been placed in a particular facility. ( *See* Pl. Opp. at 3.) This case is thus easily distinguished from cases holding that prison officials may not transfer an inmate solely in retaliation for the exercise of his constitutional rights. *See, e.g., Meriwether v. Coughlin,* 879 F.2d 1037, 1046 (2d Cir.1989). Johnson has conceded both that Wynkoop did not initiate his transfer as a form of retaliation and that she had nothing to do with his designation to FCI–Elkton in particular.

Moreover, Johnson has not identified a BOP policy or practice requiring that prison officials solicit input from an inmate concerning a facility preference when a transfer is (as Johnson now concedes) required due to a change in security level. The Court has likewise been unable to locate such a BOP policy or practice, let alone a regulatory, statutory, or constitutional right to such input .[FN4]

> FN4. *See generally Montanye v. Haymes,* 427 U.S. 236, 243, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976); *Meachum v. Fano,* 427 U.S. 215, 228, 96 S.Ct. 2532, 49

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3468124 (S.D.N.Y.)
**(Cite as: 2010 WL 3468124 (S.D.N.Y.))**

L.Ed.2d 451 (1976) (prison officials have broad discretion to transfer prisoners; there is no constitutional right to placement in a particular facility).

We are likewise unaware of any requirement that the BOP take into account an inmate's preference if it happens to come to the attention of a relevant official. This is assuming that the preference does not implicate a management variable, and, at this point, Johnson does not dispute that his desire to be housed near his family does not fall within a management variable. *See* BOP Policy Statement 5100.08 at JOHNSON BOP 108–113 (listing management variables). Thus, even assuming Johnson's program review meeting had taken place in May 2007, and even assuming he had explained that he wanted to be transferred to a location near his family, Wynkoop would have been acting in a manner perfectly consistent with formal BOP protocol if she had simply disregarded Johnson's request.

Johnson makes much of the program review meeting that was scheduled for May 17, 2007, but the significance of this aborted meeting is vastly overstated. The meeting, Johnson claims, would have given him a critical opportunity to express his preference to be housed near his family. However, we have reviewed the BOP policy statement and federal regulations that govern the conduct of program review meetings, and we see nothing that suggests that prison officials should solicit an inmate's preference for a particular facility if that inmate is up for a transfer. *See* BOP Policy Statement 5322.12, *available at* http://www.bop.gov/DataSource/execute/dsFormLoc (last accessed August 17, 2010); 28 C.F.R. §§ 524.10, 524.11. At most, corrections officers are directed to review, and ensure the accuracy of, information concerning an inmate's security and custody classification (information that Johnson does not contest). *See* BOP Policy Statement 5322.12 at 6. Thus, at best, the program review meeting may have given Johnson an informal opportunity to express a transfer preference—even though that preference,

having no support in a management variable, would not have been entitled to any weight.[FN5]

FN5. Johnson does suggest that Wynkoop had an unstated policy of soliciting facility preferences from inmates up for transfers, but his evidence falls far short of establishing a genuine issue of fact on that question.

In particular, Johnson has produced affidavits from two inmates claiming that Wynkoop requested their input prior to their transfers. However, these inmates do not attest that Wynkoop affirmatively solicited their preferences *outside* the setting of a program review meeting. Here, no such review meeting took place.

In addition, one of the inmates made a request to be housed at a facility with a drug treatment program. (*See* Pl. Opp. Ex. 8A.) This, unlike Johnson's attempted request, fits within one of the BOP's management variables. *See* BOP Policy Statement 5100.08 at JOHNSON–BOP 111 ("an inmate's ability to participate in a unique program may require placement at an institution not commensurate with his or her security level"). The other inmate claims that in 2006, he requested and received a transfer from FCI–Otisville to Fort Dix. However, his affidavit, dated March 2010, was submitted from FCI–Elkton, where Johnson resides. Thus, this inmate's testimony actually lends support to the proposition that inmates have little, if any, meaningful input into where they are housed. (*See* Pl. Opp. Ex. 8.)

For her part, Wynkoop stated in the course of discovery that it was generally not her "practice" to solicit facility preferences from inmates up for transfers. (*See* Pl. Opp. at 3–4.)

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3468124 (S.D.N.Y.)
**(Cite as: 2010 WL 3468124 (S.D.N.Y.))**

**\*9** Despite the foregoing, we nevertheless recognize that a prisoner may have a cause of action when "otherwise routine administrative decisions are made in retaliation for the exercise of constitutionally protected rights." *Gill v. Mooney,* 824 F.2d 192, 194 (2d Cir.1987). Thus, given the undisputed facts and the relevant BOP protocol, and assuming the resolution of all disputed issues of material fact in favor of Johnson, the analysis of Johnson's claim comes down to the following two questions:

1. Did Wynkoop engage in an "adverse action" by ignoring Johnson's request (in 2006) to be transferred to a facility near his family-even though the request had no basis in a BOP management variable and was not entitled to any weight? FN6

> FN6. For this scenario, we assume (without finding) that Wynkoop remembered Johnson's request when she updated his information in the SENTRY database on May 15, 2007. We make this assumption despite the fact that Johnson himself has consistently been unable to identify a specific time or location when this request was made.

2. Did Wynkoop engage in an "adverse action" by failing to reschedule a legitimately-cancelled program review meeting where Johnson may have been given the opportunity to express a transfer preference—even though such a request would have had no basis in a BOP management variable and would not have been entitled to any weight? FN7

> FN7. For this scenario, we assume (without finding) that Wynkoop was obliged to reschedule the meeting, either because that was the practice in the facility or because, notwithstanding the applicable practice, she had told Johnson that the meeting would be rescheduled. We never-

theless note that the record is unclear as to whether Wynkoop represented that she would affirmatively re-schedule Johnson's meeting or whether Johnson needed to initiate the process. We also note the inherently problematic nature of an inmate relying on a corrections officer's representation when it is provided, as Johnson concedes, in the midst of a facility-wide lockdown.

To answer these questions, we must determine whether the conduct at issue (even assuming it was retaliatory in intent) would deter "a similarly situated individual of ordinary firmness" from exercising his constitutional rights. *Gill,* 389 F.3d at 381. We have been unable to identify a case in which analogous retaliatory action was at issue, but upon careful consideration, we answer the question in the negative.

We have seen no "evidence that permits us to conclude that, under the circumstances [at issue], a reasonable prisoner would have been deterred from the exercise of his constitutional rights." *Dawes,* 239 F.3d at 493. Nor do we perceive any basis for finding that a reasonable prisoner would be so deterred, given (1) that a "similarly situated" prisoner would be making a non-binding request in the first place; (2) that the request would almost certainly be disregarded because there is no relevant management variable to accommodate it; and (3) that there is otherwise no basis in BOP policy or protocol for soliciting or accommodating such a request. Put differently, the chance that such a request would be accommodated in the first place is far too remote and speculative for the alleged conduct to truly deter an inmate of "ordinary firmness" from exercising his constitutional rights.

**C. Johnson's Purported Issues of Fact**
We close by addressing the other purported issues of fact raised by Johnson. In each case, the issue is irrelevant to our legal analysis and/or based on a demonstrably flawed understanding of BOP policy.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

First, Johnson claims that he was told by Wynkoop in early June 2007 that his May 17, 2007 program review meeting had in fact been rescheduled for May 18, 2007 but that he had missed it. (Pl. Opp. at 6.) We account for this in our legal analysis by assuming that Wynkoop failed to reschedule his program review meeting. Johnson's factual allegation thus only goes to Wynkoop's mental state, which is irrelevant to whether she engaged in an "adverse action" against the plaintiff.

**\*10** Second, Johnson contends that after he missed the May 17, 2007 meeting, Wynkoop "falsely entered a notation" on a form indicating that he had been absent. (*Id.* at 6–7.) The actual notation—"I/M [inmate] no show"—hardly suggests a malicious intent, but again, this is at best only relevant to corroborating Wynkoop's allegedly retaliatory mindset.

Third, Johnson alleges that Wynkoop gave him an "average" work performance rating in May 2007 when he should have received a "good" rating. (*Id.* at 7.) Again, this is irrelevant to whether the actions at issue in this suit were "adverse," particularly since an inmate's work performance rating is not one of the factors used to determine an inmate's security level. *See generally* BOP Policy Statement 5100.08 at JOHNSON–BOP 121–41.

Fourth, Johnson claims that he was not given notice of, and therefore missed, a team inmate review and progress report on June 19, 2007. (*Id.* at 8.) This is inconsistent with Johnson's complaint (*see* Am. Compl. at 6.), but in any event, the dispute is irrelevant, since the DSCC had designated Johnson to FCI–Elkton six days earlier, on June 13, 2007.

Sixth, Johnson argues that if he truly "missed" his program review meeting because he was supposed to reschedule it, "[w]hy was no disciplinary action taken?" (Pl. Opp. at 8.) As a matter of BOP policy, Wynkoop had broad discretion in determining whether to initiate disciplinary action against an inmate in such circumstances. (*See* Def. Rep.

Mem., Banks Decl. ¶¶ 5, 6.) Thus, even assuming it were relevant (which it is not), Wynkoop's refusal to discipline Johnson would not support an inference of retaliatory animus. Indeed, her exercise of discretion in Johnson's favor more aptly supports the opposite inference.

Finally, Johnson argues that Wynkoop's retaliatory intent can be inferred from the fact that he was not designated for a transfer until May 2007, even though the relevant BOP guidelines went into effect in September 2006 and he had a program review shortly thereafter, on November 7, 2006. (Pl. Opp. at 9.) He argues that the only thing that changed between November and May was the filing of his initial complaint in this proceeding. Of course, this is precisely the legal theory that the plaintiff disclaims elsewhere in his papers when it suits his strategic purposes. (*See* Pl. Opp. at 2–3.) But in any event, the undisputed evidence shows that under BOP policy, the September 2006 revisions to the inmate classification policy did not affect an inmate's security levels until that inmate had his next *annual* custody classification review. (Def. Mem., Aycock Decl. ¶ 17.) In Johnson's case, the first such regularly scheduled classification update after September 2006 was, in fact, set for May 2007. (Def. Mem., Wynkoop Decl. ¶¶ 12, 14.)

### *CONCLUSION*

For the foregoing reasons, Wynkoop's motion (docket no. 53) is granted. The Clerk of the Court is respectfully directed to close this case.

**\*11** We further certify, pursuant to Fed. R.App. P. 24(a)(3)(A), that any appeal by the plaintiff of this decision would not be taken in good faith and that he is therefore not entitled to proceed *in forma pauperis* for the purposes of such an appeal.[FN8]

> FN8. The length of this opinion should not be misinterpreted to suggest that there is any merit to the plaintiff's claim. Our extensive treatment of the case is primarily attributable to the plaintiff's shifting positions, the substantial discovery that oc-

curred, and the need to comprehensively address the relevant BOP policies.

S.D.N.Y.,2010.

Johnson v. Killian

Not Reported in F.Supp.2d, 2010 WL 3468124 (S.D.N.Y.)

END OF DOCUMENT